IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| ANTHONY R. JOHNSON, SR. and JACQUALYNE Y. JOHNSON, individually and on behalf of The Estate of ANTHONY R. JOHNSON, JR, | § § § § § | |
| Plaintiffs, | § § | CIVIL ACTION NO. 4:24-CV-686 |
| v. | § § | JURY TRIAL DEMANDED |
| TARRANT COUNTY, TEXAS, JOE GARCIA, RAFAEL MORENO, JAQUAVIOUS SIMMONS, ELIJAH MAREZ, JOHNATHAN NYMOEN, TYRONE CALDWELL, ROYCE MOODY, KIMBERLY NOBLES, PHYLICIA HOLLIE, ANGEL SANCHEZ, JEVON STUBBS, STEVEN GIL, KYLE LONGO, DAVID PITCOCK, and ROBERT RUSS, | § § § § § § § § § | |
| Defendants. | § § | |

**<u>PLAINTIFFS' SECOND AMENDED COMPLAINT</u>**

COMES NOW, Anthony R. Johnson, Sr. and Jacqualyne Y. Johnson, individually and on behalf of the Estate of Anthony R. Johnson, Jr., deceased, complaining of Defendants Tarrant County, Texas, specifically the Tarrant County Jail (the "County" or "TCJ"), Joe Garcia ("Garcia"), Rafael Moreno ("Moreno"), JaQuavious Simmons ("Simmons"), Elijah Marez ("Marez"), Johnathan Nymoen ("Nymoen"), Tyrone Caldwell ("Caldwell), Royce Moody ("Moody"), Kimberly Nobles ("Nobles"), Phylicia Hollie ("Hollie"), Angel Sanchez ("Sanchez"), Jevon Stubbs ("Stubbs"), Steven Gil ("Gil"), Kyle Longo ("Longo"), David Pitcock ("Pitcock"), and Robert Russ ("Russ"), and for their causes of action will respectfully show unto this Honorable Court as follows:

# I.

## NATURE OF THE ACTION

1. Anthony Johnson, Jr. ("Anthony" or "Johnson") is no longer alive due to the inhumane treatment, lack of compassion, egregious and unconscionable actions, inexcusable neglect and cowardice acts of multiple jailers at the Tarrant County Jail ("TCJ"). The actions of the Tarrant County jailers result from the lack of oversight, policies, training, supervision and policies under the direction of Tarrant County Sheriff Bill Waybourn ("Waybourn") and former Executive Chief Deputy Charles Eckert ("Eckert"). Moments before Moreno's heinous acts caused Johnson to experience a slow and painful death, Defendant Simmons, for no justifiable reason, did one of the most senseless and heartless things one could do when he discharged pepper spray directly into Anthony Johnson, Jr.'s mouth. Additionally, Defendant Moreno, a three hundred plus pound jailer, pinned his knee on Johnson's back, using bodyweight force, while Johnson was in a prone position in handcuffs, preventing him from breathing all while the Defendant Jailers failed to intervene. Johnson was held down by Defendants Simmons, Marez and Nymoen, as Moreno used bodyweight force on Johnson to end his life. At no time did Defendants Garcia, Simmons, Marez, Nymoen, Caldwell, Moody, Nobles, Hollie, Sanchez, Stubbs, Gill, Pitcock, Longo or Russ attempt to intervene although they were in a position to do so.

2. Defendants Moreno, Garcia, Simmons, Marez, Nymoen, Caldwell, Moody, Nobles, Hollie, Sanchez, Stubbs, Gill, Pitcock, Longo and Russ, jailers with the Tarrant County Sheriff's Office ("TCSO"), consciously disregarded the rights of Johnson, knowing that the Policymakers would ratify and/or approve of their actions. Defendants Moreno, Simmons, Marez, Nymoen, Caldwell, Moody, Nobles, Hollie, Sanchez, Stubbs, Gill, Pitcock and Russ's actions in repeatedly

punching, kicking, discharging pepper spray into Johnson's mouth[1], using bodyweight force to pin Johnson down after placing him in a prone position while he was in handcuffs without checking on him, and not rendering any medical assistance or immediately contacting emergency personnel, was not that of a reasonable jailer. Defendant Moreno's action in pinning his knee on Johnson's back and neck while Johnson was handcuffed in a prone position, preventing Johnson from breathing, was not that of a reasonable jailer. Defendants Garcia, Simmons, Marez, Nymoen, Caldwell, Moody, Nobles, Hollie, Sanchez, Stubbs, Gill, Pitcock, Longo and Russ's failure to intervene, was not that of a reasonable jailer. The Defendant Jailers were acting pursuant to the customs, policies and training, or lack thereof, received from TCSO, all of which were the moving force in the death of Johnson. The attack on Johnson was not an isolated incident, but rather the result of a pattern and practice, developed under the leadership and direction of Sheriff Waybourn and Executive Chief Deputy Eckert and ratified by the Tarrant County Commissioners. Over 60 inmates have died under suspicious circumstances while in custody at the TCJ. At least 7 inmates at the TCJ have died in 2024 alone.

3. The Constitution makes it clear that all people should be free from cruel and unusual punishment. These tenets are particularly true for those who take an oath to protect and defend these civil liberties. Individuals who are in the custody and care of the TCJ have a clear expectation that those in positions of authority will protect them and provide them with the most basic and humane level of medical treatment and protection from harm. What happened to Anthony Johnson, Jr. was just the opposite and not a surprise based on Sheriff Waybourn and the County's numerous failures and/or refusal to adequately discipline jailers who are known to violate

[1] Pepper Spray contains an inflammatory compound called capsaicin. It causes burning, pain and tears when it comes into contact with a person's eyes.

the law.[2] The Defendants ignored the fundamental rights afforded to Anthony Johnson, Jr. and instead subjected him to cruel and unusual treatment that the Constitution forbids.

4. Anthony Johnson, Jr.'s death was tragic and totally preventable and is the result of a custom and practice that has existed in Tarrant County, specifically TCJ, for well over a decade. Since 2017, over sixty inmates have died while in custody at TCJ, yet no additional policies, supervision, procedures and/or training have been provided to those who had a legal and moral obligation to protect inmates, specifically Johnson.

5. The events of Anthony Johnson, Jr.'s death was recorded and the treatment he received prior to and after his death was observed by other inmates and Tarrant County Jailers. Johnson's last minutes on this earth were taken away by individuals who had a total disregard for the sanctity of life. The Defendant Jailers watched Anthony Johnson, Jr. die as he pleaded for help. Despite the egregious and inhumane actions of the Defendant Jailers, only Moreno and Garcia were terminated and/or indicted by a Tarrant County grand jury for the murder of Anthony Johnson, Jr. Defendants Simmons, Marez, Nymoen, Caldwell, Moody, Nobles, Hollie, Sanchez, Stubbs, Gill, Pitcock, Longo and Russ, despite the egregiousness of their acts and involvement in the death of Anthony Johnson, Jr., have not been disciplined nor were they terminated.[3]

---

[2] In 2019, Defendant Simmons was investigated by the Garland Police Department in connection with a habitation burglary in Garland, Texas. During the course of the investigation, latex prints of the value were developed and collected. A latent print was collected from the scene into the Federal NGI database. On 5/3/2019, the entry resulted in a hit against the left finger of Defendant Simmons. Despite knowledge of this serious incident, Simmons was hired and remained an employee of the TCSO. In 2022, Defendant Simmons and other jailers employed by the TCSO were investigated for introducing prohibited items inside the secured area of the TCCC. It was alleged that Simmons entered the secured area of the jail with an unlabeled pill organizer containing several unidentified pills. One of those pills was identified as Acetaminophen containing codeine. Additionally, several of the pills were unidentified by the medical staff. When the severity of the allegations was brought forward to Sheriff Waybourn, he abruptly ended the investigation. Simmons was not adequately disciplined and/or terminated for introducing prohibited contraband inside a secured area of the TCCC although there have been a number of suspicious deaths at the TCJ caused by fentanyl and other illegal contraband. Had Waybourn terminated Simmons, Anthony may be alive today.

[3] On June 29, 2024, Defendant Simmons allegedly resigned from the Tarrant County Sheriff's office. In the personal comments of the resignation form, Defendant Simmons indicated that his decision to resign was due to the Tarrant County Sheriff Office's inability to carry his Texas Peace Officer Commission.

6. This is a civil rights action brought by the Plaintiffs against Tarrant County, Texas, specifically the Tarrant County Jail, and Tarrant County Jailers, Defendants Garcia, Simmons, Marez, Nymoen, Caldwell, Moody, Nobles, Hollie, Sanchez, Stubbs, Gill, Pitcock, Longo and Russ, for their use of excessive, deadly force, for failing to intervene, for failing to provide Anthony Johnson, Jr. with adequate medical aid and attention in the face of a known, serious medical emergency, resulting in the death of Johnson under the color of law in violation of his individual rights under the Fourth and Eighth Amendments of the United States Constitution and in violation of his civil rights pursuant to 42 U.S.C. § 1983. The premature death of Johnson was caused by the Defendants' deliberate indifference to an ongoing pattern of such violations which are well documented. This widespread, decades-long pattern made obvious the need for updated policies, training, supervision and discipline to ensure inmates are not treated in an inhumane and violent manner, including the refusal to provide adequate medical attention, without which violations of inmates' rights under the Eighth Amendment of the United States Constitution were virtually certain to continue. The natural result of this deliberate indifference to the need to enact policies and provide employees with the necessary training and supervision was to cause Anthony Johnson, Jr. and over sixty inmates to experience abusive treatment and, ultimately, to be allowed to die. Such cruel and unusual circumstances under the color of law violated Anthony Johnson Jr.'s individual rights under the Fourth and Eighth Amendments of the United States Constitution and in violation of his civil rights pursuant to 42 U.S.C. § 1983.

7. Furthermore, Plaintiffs are entitled to recover damages arising from the decedent's wrongful death complaining of the various acts detailed below and for their wrongful death cause of action. It was clearly established during the period when the Policymakers knew of the need to enact policies, training, and supervision to protect these constitutional rights that inmates had a

constitutionally protected right to be free from a prison official's deliberate indifference to an inmate's serious medical needs. It was also clearly established law at the time of the incident that using excessive, deadly force, excessive use of pepper spray, failing to render aid or to call for emergency assistance in response to a serious threat to an inmate's life constitute deliberate indifference. Moreover, Defendants were aware that Anthony Johnson, Jr. was in medical distress and knew that he faced a substantial risk of serious medical harm but ignored their duty to timely render or seek medical assistance for Johnson. While Johnson was in handcuffs, Defendants Garcia, Simmons, Marez, Nymoen, Caldwell, Moody, Nobles, Hollie, Sanchez, Stubbs, Gill, Pitcock, Longo and Russ repeatedly punched Johnson, Simmons and Moody discharged pepper spray into Johnson's face and mouth, and they used their bodyweight to pin Johnson face down to the ground. Also, according to Defendant Marez, Simmons placed his knee on Johnson's right shoulder blade and neck to inflict pain. Additionally, Defendant Moreno pinned Johnson on the ground with the assistance of Defendants Garcia, Simmons, Marez, Nymoen, Caldwell, Moody, Nobles, Hollie, Sanchez, Stubbs, Gill, Pitcock, Longo and Russ, while Johnson was in a prone position, restricting Johnson's breathing. The Defendant Jailers followed the County's custom of using excessive force and withholding medical attention from inmates, especially when inmates are suffering from a mental illness. For these civil rights violations and other causes of action discussed herein, Plaintiffs seek to hold the Defendants responsible and to compensate them for the damages they suffered from the wrongful death of their son, Anthony Johnson, Jr.

8. Due to the willful neglect by the Defendants, and their refusal to provide or seek medical assistance for Anthony Johnson, Jr., despite an obvious need to do so, Anthony Johnson, Jr. became nonresponsive and subsequently died. The Defendants had a duty to provide adequate medical care for Anthony Johnson, Jr., while he was in their custody and care, but

refused to do so. The Defendants were deliberately indifferent to Anthony Johnson, Jr.'s known medical issues as they ignored his plea that he could not breathe, in violation of his Eight Amendment rights under the United States Constitution secured pursuant to 42 U.S.C. § 1983. The Defendants were aware of Anthony Johnson, Jr.'s medical conditions and the impact of their refusal to adequately care for Anthony Johnson, Jr.'s medical conditions became obvious as he cried out to the Defendant Jailers for help, which was ignored. Instead of assisting Johnson, Defendants Russ and Longo placed Johnson in a transport chair although it was clear he was in medical distress and needed attention.

9. Defendant County and its policymakers, County Judge Tim O'Hare ("O'Hare"), Sheriff Waybourn and Executive Chief Deputy Eckert failed to properly train, supervise, screen, discipline, transfer, counsel or otherwise control employees responsible for monitoring and caring for inmates and those who are known, or who should have been known, to engage in the use of excessive force, including those jailers repeatedly accused of such acts. In fact, the County was aware of Defendant Simmons and the other jailers' excessive use of force on inmates but did not take any steps to stop it. The Policymakers, specifically County Judge O'Hare, along with Sheriff Waybourn, Executive Chief Deputy Eckert and the Tarrant County Commissioners, had a duty, but failed, to enact, implement, and enforce policies, practices, and procedures for the TCJ and the TCSO that respected Anthony Johnson, Jr.'s constitutional rights. Moreover, patterns of inadequate medical care, inmates' death and inadequate training and supervision regarding adequate medical care to inmates constitute a *de facto* policy of deliberate indifference to the medical needs of inmates like Anthony Johnson, Jr. The County and its Policymakers knew that without such policies, the likely result was that the medical needs of inmates would continue to be ignored or treated inadequately, if at all and jailers would use excessive force on inmates. But

the County and its Policymakers failed to remedy these failures. The failure of the County and its Policymakers—specifically County Judge Tim O'Hare, Sheriff Waybourn and Executive Chief Deputy Eckert—to implement the necessary policies, training, and supervision deprived Anthony Johnson, Jr. of his rights under the Constitution and caused him unwarranted and excruciating physical and mental anguish, and eventually his death. The Defendant Jailers consciously disregarded the rights of Anthony Johnson, Jr., knowing that County Judge Tim O'Hare, Sheriff Waybourn, Executive Chief Deputy Eckert and the Tarrant County Commissioners would ratify or approve of their actions. The Tarrant County Commissioners and the Policymakers, including Sheriff Waybourn and Executive Chief Deputy Eckert, were aware of the problems at the TCJ years before the death of Anthony Johnson, Jr. as it has been well documented and discussed at the meetings of the Commissioners, but they failed to take any action to prevent the wrongful and preventable deaths of over sixty inmates who died prior to Anthony Johnson, Jr.'s incident and resulting death. Under the leadership of Sheriff Waybourn and Executive Chief Deputy Eckert, policies or customs were created, tolerated and allowed to persist that resulted in the death of over 60 inmates. The deaths at the TCJ are higher than the National Average. Tarrant County Commissioner Alissa Simmons indicated during a radio interview that the jail deaths at Tarrant County are a problem.[4] The Commissioners were aware of the problems at the Tarrant County jail but did not do anything to prevent the deaths of inmates. Instead, the Commissioners rewards Sheriff Waybourn despite the deaths at the TCJ.

10. These violations were committed against Anthony Johnson, Jr. because of the policies and customs or lack thereof of the County, specifically the Tarrant County Sheriff's Office. The County has a history and practice of not assuring that Jailers receive the required

[4] Impact Texas | News Talk WBAP-AM

certification to assure the Jailers are aware of how to safely use pepper spray or providing training, including use of force, to its employees tasked with the responsibility for monitoring jailers and providing adequate medical care to individuals under its care. The County, Sheriff Waybourn and Executive Chief Deputy Eckert had a duty to enact and implement policies, practices, and procedures for TCJ that respected Anthony Johnson, Jr.'s constitutional rights to protection and equal treatment under the law and had a duty to adequately train jailers consistent with such policies, practices, and procedures.

11. In an article published by KERA NEWS, the following was discovered. "Three years before deaths inside the Tarrant County Jail led to renewed scrutiny by elected officials and community members, in 2020, Lt. Robert Kelley-who no longer works for the TCSO—was assigned by command staff to create general orders for the County governing employee conduct. The draft, shared with department leaders in 2021, outlined how County employees should handle a variety of situations, including use of force, restraints and medical consideration for people in custody. In the use-of-force chapter, the general orders explicitly state any employees who observe another law enforcement officer using force must intervene if the force is not objectively reasonable and they have an opportunity to prevent harm. According to the article published by KERA News, the general orders were never implemented.[5] In internal meetings between 2018 and 2024, sheriff's office employees shared concerns about existing division policies and sought clarity on how to move forward, citing confusion over how to keep up with informal updates and unclear procedures. Some division policies, including the jail's use-of-force policy, have not been updated in more than a decade, according to previous KERA reporting." Internal meeting notes obtained by KERA News show sheriff's office staff have raised concerns about out-of-date

[5] Amid scrutiny of Tarrant County Jail deaths, internal records reveal scrapped policy | KERA News

policies for several years before Johnson's death but there were no updates nor did the Tarrant County jailers receive the necessary training on how employees handle use of force incidents. In periodic meetings over the last six years, staff expressed confusion on how to read unofficial updates to standard operating procedures, requested training on new defensive techniques but did not receive any and questioned how to remain safe but no answers were provided. The standard operating procedures are out of date and not been updated for over a decade.[6]

12. Plaintiffs bring this action for the wrongful death of Anthony Johnson, Jr., and on behalf of the estate of Anthony Johnson, Jr. for the pain and suffering he experienced prior to his death.

13. Plaintiffs herein comply with the pleading requirements of Federal Rule of Civil Procedure Rule 8(a)(2) and the requirements of *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) that "a claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Likewise, Plaintiffs herein comply with the pleading requirements of Federal Rule of Civil Procedure 10(b). *See* Fed. R. Civ. P. 10(b) (providing that "[i]f doing so would promote clarity, each claim founded on a separate transaction or occurrence . . . must be stated in a separate count or defense.").

## II.

## PARTIES

14. Plaintiff **Anthony R. Johnson, Sr.**, the surviving father of the Decedent, is a citizen of the United States and a resident of Fort Worth, Texas. Anthony R. Johnson, Sr. is the biological father of the Decedent and brings this wrongful death action pursuant to Tex. Civ. Prac. & Rem. Code section 71.004(b) as applied under 42 U.S.C § 1983 and all other applicable laws

[6] *Id*.

complaining of the various acts listed below.

15. Plaintiff **Jacqualyne Y. Johnson**, the surviving mother of the Decedent, is a citizen of the United States and a resident of Fort Worth, Texas. Jacqualyne Y. Johnson is the biological mother of the Decedent and brings this wrongful death action pursuant to Tex. Civ. Prac. & Rem. Code section 71.004(b) as applied under 42 U.S.C § 1983 and all other applicable laws complaining of the various acts listed below.

16. Plaintiff **Jacqualyne Y. Johnson** also brings this survival action on behalf of Plaintiff, **the Estate of Anthony Johnson, Jr.** Jacqualyne Y. Johnson is the biological mother and an heir of the deceased, Anthony Johnson, Jr. No administration of the Estate of Anthony Johnson, Jr. is pending, and none is necessary as Decedent had no debts at the time of his death, no real property, and no children. Therefore, Plaintiff Jacqualyne Y. Johnson is authorized and has standing to bring this survival action on behalf of the Estate of Anthony Johnson, Jr., pursuant to Tex. Civ. Prac. & Rem. Code section 71.021(a), as applied under 42 U.S.C § 1983 and all other applicable laws complaining of the various acts listed below.

17. Defendant **Tarrant County**, specifically through the operations, employees, and policies promulgated for and on behalf of the Tarrant County Jail, is in Fort Worth, Texas. This facility is operated by the Tarrant County Sheriff's Department and houses adult men and women—both misdemeanor and felony inmates—who have been arrested by local county or municipal law enforcement and are awaiting trial. The jail has been under the leadership of Sheriff Bill Waybourn, since his elected term began in January 2017.[7] The Tarrant County Jail books approximately 35,000 people per year, with the capacity to hold approximately 5,000 people across the five facilities in Fort Worth on any given day.[8] As of March 2023, the inmate

[7] *Sheriff's Office*, Tarrant County TX, https://www.tarrantcountytx.gov/en/sheriff.html.
[8] *Detention Bureau*, Tarrant County TX, https://www.tarrantcountytx.gov/en/sheriff/detention-bureau.html.

population in Tarrant County Jail was 3,957 inmates.[9] Only 370 of those individuals (9%) were listed as convicted;[13] the remainder were classified as pretrial, parole violators, bench warrants, or "other."[10] Defendant Tarrant County has been served but have not appeared.

18. **Defendant Joe Garcia**, upon information and belief, is a resident of Fort Worth, Texas, and at all times material herein was a jailer for the County. Defendant Garcia has been served but has not filed an answer.

19. **Defendant Rafael Moreno**, upon information and belief, is a resident of Fort Worth, Texas, and at all times material herein was a jailer for the County. Defendant Moreno is being sued in his individual capacity. Defendant Moreno has been served but has not field an answer.

20. **Defendant JaQuavious Simmons**, upon information and belief, is a resident of Fort Worth, Texas, and at all times material herein was a jailer for the County. Defendant Simmons is being sued in his individual capacity. Defendant Simmons has been served and has appeared in this case.

21. **Defendant Elijah Marez**, upon information and belief, is a resident of Fort Worth, Texas, and at all times material herein was a jailer for the County. Defendant Marez is being sued in his individual capacity. Defendant Marez has been served and has appeared in this case.

22. **Defendant Johnathan Nymoen**, upon information and belief, is a resident of Fort Worth, Texas, and at all times material herein was a jailer for the County. Defendant Nymoen is being sued in his individual capacity. Defendant Nymoen has been served and has appeared in this case.

---

[9] *County Jail Population*, Texas Commission on Jail Standards, https://www.tcjs.state.tx.us/population-reports/.
[13] *Id.* (summing columns "Convicted Felons," "Conv. Misd.," "Conv. SJF Sentenced to State Jail," and "Conv. SJF Sentenced to Co. Jail Time").
[10] *Id.*

23. **Defendant Tyrone Caldwell**, upon information and belief, is a resident of Fort Worth, Texas, and at all times material herein was a jailer for the County. Defendant Caldwell is being sued in his individual capacity. Caldwell may be served at 4817 Waterford Dr., Fort Worth, Texas 76179 or wherever he may be found.

24. **Defendant Royce Moody**, upon information and belief, is a resident of Fort Worth, Texas, and at all times material herein was a jailer for the County. Defendant Moody is being sued in his individual capacity. Moody may be served at 4817 Waterford Dr., Fort Worth, Texas 76179 or wherever he may be found.

25. **Defendant Kimberly Nobles**, upon information and belief, is a resident of Fort Worth, Texas, and at all times material herein was a jailer for the County. Defendant Nobles is being sued in her individual capacity. Nobles may be served at 4817 Waterford Dr., Fort Worth, Texas 76179 or wherever she may be found.

26. **Defendant Phylicia Hollie**, upon information and belief, is a resident of Fort Worth, Texas, and at all times material herein was a jailer for the County. Defendant Hollie is being sued in her individual capacity. Hollie may be served at 4817 Waterford Dr., Fort Worth, Texas 76179 or wherever she may be found.

27. **Defendant Angel Sanchez**, upon information and belief, is a resident of Fort Worth, Texas, and at all times material herein was a jailer for the County. Defendant Sanchez is being sued in her individual capacity. Sanchez may be served at 4817 Waterford Dr., Fort Worth, Texas 76179 or wherever she may be found.

28. **Defendant Jevon Stubbs**, upon information and belief, is a resident of Fort Worth, Texas, and at all times material herein was a jailer for the County. Defendant Stubbs is being sued in his individual capacity. Stubbs may be served at 4817 Waterford Dr., Fort Worth, Texas

76179 or wherever he may be found.

29. **Defendant Steven Gil,** upon information and belief, is a resident of Fort Worth, Texas, and at all times material herein was a jailer for the County. Defendant Gil is being sued in his individual capacity. Gil may be served at 4817 Waterford Dr., Fort Worth, Texas 76179 or wherever he may be found.

30. **Defendant Kyle Longo**, upon information and belief, is a resident of Fort Worth, Texas, and at all times material herein was a jailer for the County. Defendant Longo is being sued in his individual capacity. Longo may be served at 4817 Waterford Dr., Fort Worth, Texas 76179 or wherever he may be found.

31. **Defendant David Pitcock**, upon information and belief, is a resident of Fort Worth, Texas, and at all times material herein was a jailer for the County. Defendant Pitcock is being sued in his individual capacity. Pitcock may be served at 4817 Waterford Dr., Fort Worth, Texas 76179 or wherever he may be found.

32. **Defendant Robert Russ**, upon information and belief, is a resident of Fort Worth, Texas, and at all times material herein was a jailer for the County. Defendant Russ is being sued in his individual capacity. Russ may be served at 4817 Waterford Dr., Fort Worth, Texas 76179 or wherever he may be found.

## III.

## JURISDICTION AND VENUE

33. Jurisdiction exists in this court pursuant to 28 U.S.C. §§ 1331 and 1343 as this action is brought under, inter alia, the Fourth, Eighth and Fourteenth Amendments of the United States Constitution and 42 U.S.C. § 1983, to redress the deprivation of rights, privileges and

immunities guaranteed to decedent Anthony Johnson, Jr. by constitutional and statutory provisions.

34. Venue is proper in this court because the causes of action occurred within the Northern District of Texas, Fort Worth Division.

## IV.

## FACTS

**Forty-Eight Hours before Anthony Johnson, Jr.'s tragic death.**

35. Anthony Johnson, Jr. was a 31-year-old Marine veteran who was diagnosed with schizophrenia. Schizophrenia is a mental health condition that affects everything from how you think to how you feel and behave. Schizophrenia can be caused or triggered by certain environmental factors like stress or danger. There is no way to prevent schizophrenia. But staying with a treatment plan can help stop symptoms from returning or getting worse. TCJ was aware when Johnson was booked in on April 20, 2024, that Johnson was dealing with a mental illness but failed to provide him with his medication or the proper care. Johnson disclosed his mental illness on the Tarrant County Registration Form.

36. On the morning of April 19, 2024, Johnson's mother noticed Anthony with manic behavior and decided she would get him some help. Anthony had not slept for 48 hours and was not himself. However, at no time was Anthony violent and was not trying to harm himself or anyone else. In fact, Anthony wanted to be evaluated because of his desire to get better.

37. At approximately 10:01 a.m., Anthony's mother made an initial call to Wellbridge Fort Worth, located at 6200 Overton Ridge Blvd., Fort Worth, TX 76132, to have Anthony evaluated and admitted. Anthony's mother made an appointment to bring him in for evaluation at 1:00 p.m. but because the situation was so acute she called back ten minutes later to ask if she

could bring Anthony immediately. The intake worker advised Mrs. Johnson to bring Anthony now.

38. At approximately 10:45 a.m., Anthony was evaluated by an employee of Wellbridge for approximately fifteen minutes. Shortly thereafter, a nurse advised Mrs. Johnson that because Anthony was not a danger to himself or anyone else, they were refusing to admit him. Confused by the nurse's response, Mrs. Johnson explained why she had brought Anthony in for an evaluation, but the nurse cut her off and stated that Mrs. Johnson needed to take Anthony to a psychologist or psychiatrist for further evaluation. Anthony was saddened by the fact that Wellbridge had refused to admit him because he clearly was in a state of mania. Anthony and his mother left Wellbridge and stopped to talk to Janell Johnson, Anthony's sister, who they met near their home to explain what happened. Anthony was disappointed because Wellbridge would not treat him. Anthony got out of the car and proceeded to his home while his mother talked to Janell. When Mrs. Johnson arrived home at approximately 11:15 a.m., Anthony was packing his backpack and told his mother he was leaving. Mrs. Johnson talked to Anthony for a few minutes before he left home. That was the last time Mrs. Johnson saw her son alive.

39. At approximately 6:14 p.m. on Friday, April 19, 2024, Mrs. Johnson received a call from Anthony stating he had been arrested and was at the Saginaw police station and did not know when he would see her again. According to Mrs. Johnson, Anthony sounded depressed and sad. At that point, Mrs. Johnson did not know why her son had been arrested or what he had been charged with. She attempted to get more details of Anthony's arrest and bail amount but did not hear from Anthony again until the following day.

40. On April 20, 2024 at approximately 1:02 p.m., Anthony called his family to inform them that he was at the Tarrant County Jail. Anthony advised his mother what he had been

charged with and she assured him that they would take care of everything by getting MHMR involved and bailing him out. Anthony's parents told him to be safe and they would talk as soon as they had taken care of what was needed. Anthony sounded upbeat and reassured his father, Anthony Sr., that he would be okay. Anthony's last words to his mother was "I got this momma."

**Anthony Johnson, Jr.'s encounter with the Defendant Jailers.**

41. On or about April 21, 2024, Defendants Simmons entered the cell Johnson occupied to allegedly conduct a search for contraband. Upon information and belief, Defendant Simmons had words with Johnson earlier and according to witnesses was out to get Johnson. In violation of the accepted jail standards, Johnson was placed in a cell that had not been clean or searched prior to allowing him to occupy that cell. The County failed to remove several items from the cell, which could have caused serious harm to Johnson. Anthony had not gotten much sleep and had not received any of his medication, so he was in a confused state when Simmons approached him. The Defendants were aware of Johnson's medical condition but failed to take the proper steps when dealing with someone with schizophrenia as they had not received the proper training. Johnson was singled out by Defendants Simmons.

42. Defendants Simmons, Caldwell, Marez, Nymoen and Moody started an altercation with Johnson who stood only 5'4 inches tall and weighed 165 pounds. Defendants Simmons, Caldwell, Marez, Marez, Nymoen and Moody forcefully removed Johnson from the cell he was in and physically attacked Johnson and threw him onto the floor. Defendants Simmons, Caldwell, Marez, Marez, Nymoen and Moody repeatedly punched and kicked a helpless Johnson. Defendants Simmons, Caldwell, Marez, Marez, Nymoen and Moody positioned themselves on top of Johnson, forcefully pinning Johnson to the ground in a dangerous manner. Defendants

Simmons and Moody[11], for no justifiable reason, discharged pepper spray directly into Johnson's mouth multiple times, causing Johnson to choke and struggle to breathe. It was clear that Defendant Simmons was intending to cause harm to Johnson. At no time did any of the Defendant Jailers attempt to stop Defendant Simmons from intentionally harming Johnson. After Johnson was placed in handcuffs, in a prone position, widely known to be dangerous and can lead to death,[12] Defendants Simmons, Caldwell, Marez, Marez, Nymoen and Moody continued their assault on Johnson.



*Figure 1 - Jailers on top of Johnson while he is in a prone position with his handcuffed behind his back.*

43. While Johnson was on the ground, in handcuffs and in a prone position, Defendant Nobles and the other Defendant jailers, summoned Defendant Moreno so that he could pin his

[11] According to Defendant Caldwell, Moody also sprayed Johnson with pepper spray.
[12] An AP investigation published in March found more than 1,000 people died over a decade's time after police used physical holds and weapons meant to be safter than guns. https://apnews.com/article/associated-press-investigation-deaths-police-encounters-02881a2bd3fbeb1fc31af9208bb0e310. In hundreds of the deaths, police violated well-known guidelines for safely restraining people. Most violations involved pinning people face down, in ways that could restrict their breathing. https://apnews.com/article/deadly-police-encounters-guidelines-broken-investigation-e79c708e9123aac2e40dcefd64cce08f

knee on Johnson's back and neck. Moreno, who weighs over three hundred pounds, grabbed the railing so that he could place his full body weight on Johnson's back and neck, preventing Johnson from moving and/or breathing. Defendants Marez and Nymoen held Johnson down as Moreno pinned his knee in Johnson's back for about 90 seconds. At the time Defendant Moreno pinned his knee in Johnson's back and neck, Johnson was not actively resisting nor was he attempting to harm anyone. Moreno stayed on top of Johnson, while Defendants Marez and Nymoen held Johnson down, despite Johnson's multiple pleas to the Defendant Jailers that he could not breathe, clearly heard by the Defendant Jailers, indicating his respiratory distress. Johnson told the Defendant Jailers he could not breathe at least two times but not one of the Defendant jailers attempted to intervene by pushing Defendant Moreno off of Johnson or offer any other assistance to Johnson knowing he was encountering respiratory distress. Instead, they watched as Johnson slowly died.

44. Defendant Garcia, who is believed to be a lieutenant and one of the individuals in charge of the Defendant Jailers, did not do anything to intervene or prevent the harm to Johnson. In fact, the Defendant Jailers allowed Moreno to remain on top of Johnson despite Johnson's plea that he could not breathe. It is well known that placing a subject face-down in a prone position after a use of force creates a substantial threat to life. The Defendant Jailers did not respond to the incident with any urgency and was not urgent in carrying out their duties and that had a detrimental effect. Johnson, who also had pepper spray discharged into his mouth and face by Defendants Simmons and Moody, was allowed to experience a slow and painful death. After Defendant Simmons and Moody discharged pepper spray directly into Johnson's face and mouth, not one of the Defendant Jailers followed the required protocol of caring for an individual after being affected by pepper spray. One of the most important components of safely using OC spray

is caring for individuals who have been affected by it. Particularly important are removing the subject from the contaminated area immediately and keeping the individual upright and breathing deeply. Jailers should help individuals rinse their faces with free-flowing, cool water. At the holding facility, officers should provide soap and cool water for removing the OC resins from the person's skin. The individual's condition should then be monitored at all times. The Defendant Officers did not check on Johnson after Simmons discharged pepper spray into Johnson's mouth although Johnson was foaming at the mouth.

45. The County did not have a policy that required the Defendant Jailers to follow the protocol of caring for an individual after being affected by pepper spray. It was obvious to the Defendant Jailers that Johnson was in respiratory/medical distress, but no medical assistance was offered to Johnson. None of the Defendant Jailers attempted to intervene to stop Simmons from discharging pepper spray directly into Johnson's mouth or to remove Moreno off of Johnson's back.



*Figure 2 - Moreno with knee pinned on Johnson's back and neck while Defendants Marez and Nymoen held Johnson down.*

46. Once Johnson was no longer responsive, the Defendants Longo and Russ placed a motionless Johnson in a wheelchair but did not otherwise attempt to provide him with the necessary medical attention. At least one of the Defendant Jailers slapped Johnson in the face although it was evident that Johnson was in serious medical distress and could not respond to a verbal or physical assault. The Defendant Jailers did not once try to perform any lifesaving procedures although they could clearly observe that Johnson was in medical distress. The Defendant Jailers knew something was seriously wrong with Johnson but did absolutely nothing to assist Johnson. Johnson was allowed to suffer before eventually dying.

47. After the incident, Sheriff Waybourn, in an attempt to protect the County and the TCJ from liability, stated that Johnson died due to a medical emergency after being sprayed with pepper spray. In support of the narrative Waybourn put out to the public, on April 22, 2024, Carrol E. Morris emailed a notification of the in-custody death of Johnson to a number of individuals, including Eckert. There was no mention of Moreno placing his knee on Johnson's back and neck, the actions of Simmons and Moody or the fact that Johnson advised the Defendant Jailers that he could not breathe. However, days after the incident was leaked to the public and the truth was exposed, Waybourn, having no choice, only then publicly admitted that Moreno should not have placed his knee on Johnson's back when Johnson was already handcuffed although the Sheriff knew that Moreno was trained to use that exact maneuver/technique on inmates and was acting pursuant to the policy of the County. Sheriff Waybourn made no mention regarding the wrongful acts of the other Defendant Jailers. Defendants Moreno and Garcia have both indicated that Tarrant County's unwritten policies and training do not prohibit them from performing the maneuver Moreno used on Johnson. In fact, Moreno was summoned to perform the dangerous physical hold on Johnson because of his size and weight.

48. At no point did Sheriff Waybourn acknowledge the wrongful conduct of Defendants Simmons, Marez, Nymoen, Caldwell, Moody, Nobles, Hollie, Sanchez, Stubbs, Gill, Pitcock, Longo and Russ, who failed to prevent the attack on Johnson. Defendants Simmons, Marez, Nymoen, Caldwell, Moody, Nobles, Hollie, Sanchez, Stubbs, Gill, Pitcock, Longo and Russ were not disciplined nor were they terminated for their role in Johnson's death. In fact, Randy Moore, an attorney representing Defendant Garcia, noted the treatment of the other jailers when he told KERA News that "he questions why is it that only Garcia and Moreno are being held accountable when inmates keep dying after rank-and-file employees are no longer working the jail." Moore further asked, "why was executive chief Eckert allowed to retire and no other supervisors, officers and medical staff are being held accountable?"[13]

**Anthony Johnson is killed by the Tarrant County jailers.**

49. The Tarrant County Medical Examiner ruled Johnson's death a homicide by mechanical and chemical asphyxia. Johnson's chemical asphyxiation was due to the improper and excessive use of pepper spray by Defendant Simmons and Moody and the manner in which it was discharged directly into Johnson's mouth and face. Despite Simmons' wrongful actions, and the pepper spray being a contributing cause of Johnson's death, Simmons and Moody were not disciplined nor were they terminated. Consistent with being assaulted by the jailers, Johnson also suffered injuries to his left shoulder, abrasions to the chest, contusions to the right anterior arm, forearm, left leg, right medial leg, right posterior leg and left anterior neck, abrasions to the fourth finger and left lateral knee, fractured ribs, and left subclavian focal soft tissue hemorrhage.

[13] Tarrant County Medical Examiner rules Anthony Johnson, Jr.'s death a homicide by asphyxiation. https://www.keranews.org/criminal-justice/2024-06-07/anthony-johnson-tarrant-jail-death-asphyxia.

50. The autopsy report prepared by the Tarrant County Medical Examiner's Office makes no mention that medications were detected in Anthony's body at the time of his death, including the antidepressant, antipsychotic, or bipolar medications that Tarrant County and the Defendant jailers knew were necessary to treat Johnson's medical conditions. And there is no indication Johnson was ever taken to an actual hospital to provide him with the proper medical attention after the incident although Sheriff Waybourn represented that Johnson died at the hospital. Johnson died at the TCJ a fact known by Waybourn. Defendants failed to provide Johnson with the proper medical attention although they knew it was required. The Policymakers were aware that inmates—including Johnson—were being mistreated and neglected at the TCJ but did absolutely nothing to prevent it.

51. Due to the actions of the Defendants, including the use of excessive, deadly force and failure to intervene by Defendants Simmons, Marez, Nymoen, Caldwell, Moody, Nobles, Hollie, Sanchez, Stubbs, Gill, Pitcock, Longo and Russ, the lack of urgency and the lack of responsiveness by the Defendant Jailers when every second counted, Johnson endured a period of pain and suffering. The County did not train its Jail Personnel how to handle Johnson or other inmates dealing with a mental illness or how to ensure that they obtained medical care adequate to address their medical needs, a right to which the Constitution entitles them. This is further evident from the fact that the Defendant Jailers did not even respond to Johnson's obvious medical crisis by immediately taking him to the hospital where he could have survived.

52. The U.S. Supreme Court has consistently stated for some time that there is an obligation to provide adequate medical care to detainees and prisoners. The source of that obligation stems from the Eighth Amendment to the U.S. Constitution, and its prohibition on "cruel and unusual" punishment. In *Bell v. Wolfish*, 441 U.S. 520 (1979), the Court ruled that the

obligation to provide such care to pre-trial detainees arises from the due process guarantees of the Fourteenth Amendment, and that failure to provide such care would essentially constitute a form of punishment imposed on persons not convicted of a crime, which is impermissible, is an obligation to provide adequate medical care to detainees and prisoners.

53. The Supreme Court has determined that "the deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,' proscribed by the Eight Amendment." *Estelle v. Gamble*, 429 U.S 97, 104 (1976) (quoting *Gregg v. Georgia*, 428 U.S. 153, 182-83 (1976)). As a result of the cruel and unusual treatment inflicted upon Johnson, he experienced severe and excruciating pain. As a result of the Defendant Jailers' failure to render proper medical aid and attention to Johnson after he had been physically assaulted and advised the Defendant Jailers that he could not breathe, he died. Johnson suffered extreme and severe mental and emotional distress, agony, and anxiety prior to his tragic death.

54. Johnson had a serious medical need of which the Defendant Jailers were aware, but they deliberately failed to provide or secure the required treatment for that need. The Defendant Jailers chose not to provide any medical assistance to Johnson despite the obvious need to do so. The Defendant Jailers knew of the risk of harm they were enhancing by failing to provide medical treatment, or by delaying such treatment. As a direct result of the Defendant Jailers consciously choosing not to immediately call for or provide medical assistance to Johnson despite being aware that Johnson was having trouble breathing, was having trouble speaking, could not stand on his own, had been sprayed in the mouth and face multiple times with pepper spray and observing Johnson become nonresponsive consistent with passing out and dying, Johnson suffered tremendously before he died.

55. The Defendant Jailers ignored Johnson's known medical distress, as he died within 48 hours of being incarcerated. The Defendant Jailers ignored Johnson's plea for help.

**Anthony Johnson Jr.'s death resulted from a widespread pattern of the County providing inmates inadequate medical care that the County and its Policymakers have known about for decades.**

56. The Texas Commission on Jail Standards similarly reports on the numbers of complaints filed regarding each jail, but not additional details about those complaints. In January 2023 alone, for instance, the Commission received at least seventeen complaints about Tarrant County Jail—the second-highest number of complaints reported amongst all 242 Texas county jails.[17]

57. Prior to Johnson's detention and subsequent incarceration at the TCJ, incidents have occurred that put the County and its Policymakers on notice of widespread acts of deliberate indifference to medical needs and the inhumane treatment of inmates at the TCJ. Since 2017, there have been over sixty deaths and countless others have suffered severe injury and illness at the TCJ, including but not limited to, the following: [14]

i. In 2020 alone, twenty-one inmates died in the custody of TCJ, more than any other jail in North Texas and at a rate that is more than 3.5 times the mortality rate at Dallas County Jail during the same time period.

ii. Tarrant County Jail has a long history of suspicious deaths occurring in their custody while doing nothing to reform their practices or to prevent future harm to inmates, including the following known incidents:

---

[14] The following information was obtained from a prior lawsuit against the County, Amended Complaint, ECF No. 32, *Congious v. City of Fort Worth et al.*, Docket No. 4:22-cv-00092 (N.D. Tex. Feb 03, 2022). The lawsuit, which includes prior incidents and allegations of wrongdoings, put the County on notice of the underlying facts alleged in the complaint. The allegations are used to establish a pattern of inadequate medical treatment and the inhumane treatment of inmates. The Tarrant County Commissioners were aware of the problems and in fact, Commissioner Simmons indicated that the jail deaths were a problem, but nothing was done to prevent further deaths, including Johnson's wrongful death.

iii. On January 16, 2019, an inmate who was suspected of suffering from mental illness or mental retardation died less than a day after she was booked into Tarrant County Jail after she was found unresponsive in her cell;

iv. On April 5, 2019, an inmate went into cardiac arrest less than six hours after being assaulted by jail staffs and died less than a day after he was booked into Tarrant County Jail (a subsequent autopsy revealed the inmate had contusions and abrasions on his lip, inside of his mouth, upper right arm, radial forearm, right wrist, left forearm, left wrist, left hand, right knee, left knee, mid back, and buttocks);

v. On July 26, 2019, an inmate who was on suicide watch was declared dead after being assaulted by jail staff (including the use of a restraint chair) less than a month after he was booked into Tarrant County Jail;

vi. On August 1, 2019, an inmate who was suspected of suffering from mental illness or mental retardation died after being assaulted by jail staff less than day after he had been booked into the Tarrant County Jail;

vii. On August 6, 2019, an inmate was rushed to the hospital less than a month after being booked into Tarrant County Jail where he stayed until his death on 31 August 2019;

viii. On February 26, 2020, an inmate who was suspected of suffering from mental illness or mental retardation died after he was found unresponsive in his cell after being booked into Tarrant County Jail just days prior;

ix. On March 4, 2020, an inmate died of cryptococcal meningitis while in the custody of the Tarrant County Jail after being booked in less than a month earlier;

x. On April 26, 2020, an inmate who had been in Tarrant County Jail's custody for less than a month was found hanging in his cell and it took over 20 minutes for EMS to arrive and provide medical assistance;

xi. On May 23, 2020, a Tarrant County Jail inmate, who was suspected of suffering from mental illness or mental retardation was hospitalized just two days after complaining that his untreated anxiety had caused him to remain awake for the last 48 hours straight, died;

xii. On June 19, 2020, an inmate was found dead in Tarrant County Jail just two days after being booked. The investigation revealed evidence that jail staff had falsified records of routine checks for hours pursuant to instructions from their supervisors. Two officers were criminally charged;

xiii. On June 24, 2020, an inmate was found dead in Tarrant County Jail after suffering an assault by jail staff;

xiv. On June 25, 2020, an inmate who was suspected of suffering from mental illness died after he was found lying naked in his cell less than 10 days after being booked into Tarrant County Jail;

xv. On September 9, 2020, an inmate was found dead in her cell just four days after being booked into Tarrant County Jail;

xvi. On September 14, 2020, an inmate died after being found unresponsive in his cell less than three months after being booked into Tarrant County Jail;

xvii. On November 10, 2020, an inmate died after being found unresponsive in his cell after being booked into Tarrant County Jail about nine days prior;

xviii. On December 17, 2020, an inmate who was suspected of suffering from mental illness was found hanging in his cell and later declared dead on 22 December 2020;

xix. On January 2, 2021, a Tarrant County Jail inmate who had been declared incompetent to stand trial died after contracting covid;

xx. On February 22, 2021, an inmate died from a brain bleed while in the custody of Tarrant County Jail;

xxi. On March 21, 2021, an inmate was found dead in their cell less than two months after being booked into Tarrant County Jail;

xxii. On July 20, 2021, a Tarrant County Jail inmate who was suspected of suffering from mental illness died;

xxiii. On August 18, 2021, an inmate died after he was found hanging in his cell just three days after being booked into Tarrant County Jail;

xxiv. On September 10, 2021, an inmate who was suspected of suffering from mental health issues and needing to detox was found dead in his cell just days after he was booked into Tarrant County Jail; and

xxv. On September 14, 2021, a Tarrant County Jail inmate who was suspected of suffering from mental health issues died after being found unresponsive in his cell.

xxvi. On April 18, 2024, Fentanyl was found in Housing Unit 59B where another inmate passed away.

58. In 2019, an inmate was pepper sprayed at least three times at close range during his intake process and died shortly after. These are only a few examples of the sixty plus deaths that are systemic in the TCJ. The County has placed and continues to place individuals in its custody at risk of serious injury and intentional harm by jailers through the unnecessary and malicious use

of force, retaliation, sexual harassment, and other behavior.[15] Through internal grievance processes, advocacy, and litigation, numerous others have raised similar issues related to delays and denial of care over the past five years. This includes failure to provide prescribed medication or mental health treatment; failing to adequately provide for those with serious mental health needs;[16] and failure to provide urgent medical care. This inadequate care has happened for years and continues to this day.

59. In 2020, the Texas Commission on Jail Standards found TCJ out of compliance with minimum observation standards, following the suicide of another individual and staff's failure to check on him. The Commission had recertified the Tarrant County Jail days after they were found out of compliance, based on a plan for conducting proper checks going forward—a plan that jail staff said they were told to disregard by their supervisors less than a month later.[17] Two other individuals lost their lives in the Tarrant County Jail during the same week as Javonte Myers, an inmate at TCJ. On multiple occasions, the Texas Commission on Jail Standards determined that the Tarrant County Jail failed to meet the Texas Minimum Jail Standards as codified in the Texas Administrative Code.[15]

---

[15] Letter from the Broadway Baptist Church Justice Committee, ICE Out of Tarrant County, United Fort Worth to Attorney Merrick Garland dated May 5, 2023.

[16] *Id*. Kaley Johnson and Nichole Manna, *Inmate accused of killing alleged child molester said mom and God 'told me to do it'*, Fort Worth Star-Telegram (Nov. 14, 2018), https://www.startelegram.com/news/local/crime/article221659165.html (reporting that individual who assaulted and killed his elderly cellmate told jail officials he needed his own cell because he has schizophrenia and hears voices); *Sutherland v. Akin*, No. 4:19-CV-216-O, 2022 WL 1409968, at *5 (N.D. Tex. May 4, 2022) (alleging that plaintiff was housed with two others who were unable to care for themselves; plaintiff was forced to change their diapers and live among feces and bloody bandages for over two weeks); Nichole Manna, *Family told 'things happened, that's the way it is' after suicide in Tarrant Jail, lawsuit says,* Fort Worth Star-Telegram (May 6, 2021), https://www.startelegram.com/news/local/fort-worth/article251213574.html (alleging that Dean Ray Stewart was not receiving needed medical health care and medication before his suicide in the Tarrant County Jail); Mitch Mitchell, Man who died by suicide at Tarrant County Jail needed mental health care, family says, Fort Worth Star-Telegram (May 29, 2020), https://www.star-telegram.com/news/local/crime/article242434871.html (same).

[17] Nichole Manna, *Dead body lay in Tarrant County Jail for 6 hours. Lawsuit alleges jailers told to lie.*, Fort Worth Star-Telegram (May 4, 2022), https://www.star-telegram.com/news/local/fort-worth/article261023947.html.

60. Jails in Texas are required to report deaths in custody.[18] These must be filed within 30 days of the death, and those with responsibility for filing can, in theory, be prosecuted for failing to complete the form or failing to report known information.[19] The Attorney General's Office maintains a database of the custodial death reports on their website.[20] According to this database, and in a 2023 letter to the DOJ prepared by the Broadway Baptist Church Justice Committee, ICE out of Tarrant County, and United Fort Worth, Tarrant County Sheriff's Office reported the following deaths for those in the jail's custody in the past six years:

- 0 reported deaths in 2017;[21]
- 2 reported deaths in 2018;
- 5 reported deaths in 2019;
- 17 reported deaths in 2020;
- 13 reported deaths in 2021;
- 11 reported deaths in 2022; and
- 3 reported deaths at the time the letter was written in 2023.

61. These numbers do not reflect the full death rate in the jail. First, there are documented deaths that do not appear in these numbers, such as the death of Billy LaRae Freeland in 2017,[21] a year when the jail reported no custodial deaths, and the death of Z.C.H., a baby born in the jail without the assistance of jail staff who died shortly after birth in 2020.[22] In 2023, Sheriff Waybourn stated that 52 people have died in the jail since 2017[23]—one more

---

[18] Letter from the Broadway Baptist Church Justice Committee, ICE Out of Tarrant County, and United Fort Worth to Attorney Merrick Garland dated May 5, 2023.; Tex. Code Crim. Proc. Ann. art. 49.18(b).
[19] Tex. Penal Code 39.05.
[20] Attorney General of Texas, Custodial Death Report Database, https://oag.my.site.com/cdr/cdrreportdeaths.
[21] The undersigned separately requested records from the Tarrant County Sheriff for any deaths in 2017, and were told that no records exist. Email from Tarrant County Sheriff's Office, April 17, 2023.
[21] *Freeland v. Tarrant Cnty., Texas*, 789 F. App'x 406, 407 (5th Cir. 2019).
[22] Nichole Manna, *How was a baby quietly born in Tarrant County Jail? Lawsuit gives new details*, Fort Worth Star Telegram (Jan. 13, 2022), https://www.star-telegram.com/news/local/fort-worth/article257300342.html.
[23] Abby Church, No murders by jailers in Tarrant County, sheriff says in touting office's accomplishments, Fort Worth Star-Telegram (Apr. 11, 2023), https://www.star-telegram.com/news/politicsgovernment/article274201955.html.

than what is documented on the Attorney General's website—thus confirming that these records are incomplete. The death rate has been especially high in the past three years. In March 2021, the Texas Commission on Jail Standards reportedly confirmed 21 in-custody deaths in the Tarrant County Jail in the previous 12 months.[24] Based on the reported average daily population rate,[25] the death rate over that year reached 540 deaths per 100,000—more than three times the most recent annual national jail mortality rate reported by the Bureau of Justice Statistics.[26] Deaths over each of the past three years far exceed the annual national mortality rate. As a federal judge has found, the documented allegations of deficient supervision, suspicious inmate deaths, and the highest mortality rate in North Texas are sufficient to "put a reasonable policymaker on notice about potential condition of confinement issues at the jail."[27]

62. As a direct and proximate result of the Defendants' conduct, the Plaintiffs have sustained substantial damages and pecuniary loss. Rather than implement policies and procedures to curtail death and/or injuries that result from Defendants' failure to take better care of jail inmates who have mental illnesses and to prevent the use of excessive, deadly force, the County has failed to implement updated written policies, provide adequate training, supervision and discipline to its jailers and to assure that the jailers receive the required certification, including the proper use of pepper spray.

63. Additionally, the TCSO did not provide the Defendant Jailers with adequate

---

[24] Dallas Morning News Editorial Board, 21 people died in the Tarrant County jail last year. That's unacceptable. (Dec. 5, 2021), https://www.dallasnews.com/opinion/editorials/2021/12/06/21-people-died-in-the-tarrant-countyjail-last-year-thats-unacceptable/.

[25] *Id.* (noting average daily jail population during this period of 3,888).

[26] E. Ann Carson, Ph.D., Mortality in Local Jails, 2000-2019—Statistical Tables (Dec. 2021), https://bjs.ojp.gov/content/pub/pdf/mlj0019st.pdf (calculating a national mortality rate of 167 deaths per 100,000 inmates).

[27] Memorandum Opinion & Order, ECF No. 61, at 27-28, *Congious v. City of Fort Worth et al.*, Docket No. 4:22cv-00092 (N.D. Tex. Mar. 31, 2023).

training on the proper use of pepper spray, the use of force, including bodyweight force, nor did they provide any training regarding positional asphyxia, despite the known dangers associated with it. Further, the Defendant Jailers failure to render medical aid and refusal and/or delay in seeking the proper medical aid and attention for Johnson amounted to cruel and unusual punishment in violation of the Eight Amendment to the United States Constitution. The need to call for emergency assistance, was clearly established law at the time of the incident.[28] A reasonable corrections officer would have known that ignoring Johnson's pleas for help and obvious signs of respiratory distress would amount to cruel and unusual punishment that violates the protections of the Eight Amendment.

64. The Defendant Jailers owed a duty to provide medical care to individuals like Johnson who are committed to their custody and known to be suffering from medical/respiratory distress. The Defendant Jailers owed Johnson a duty to not act with deliberate indifference toward his known medical condition and medical distress. The Defendant Jailers also owed Johnson a duty to not use excessive, deadly force on Johnson after he was already handcuffed and restrained, including a duty to not to use pepper spray on a prisoner who is restrained and not a threat to anyone.

64. Johnson posed no threat of imminent danger of death or great bodily harm to the Defendant Jailers, or any other person in the immediate area.

65. Plaintiffs would also show that at all times material hereto, the Defendant Jailers were acting under the color of law at all relevant times.

66. Moreover, no reasonably competent jailer would have concluded that the actions of the Defendant Jailers described herein would not violate Johnson's constitutional rights. In other

[28] *Reed v Nacogdoches County*, No. 22-40126 (5th Cir. 2023).

words, no reasonably prudent jailer under similar circumstances could have believed that the Defendant Jailers' conduct was justified nor was the treatment of Johnson reasonable.

67. Defendant, Tarrant County, has a longstanding record of not providing jailers with adequate training, policies, adequate supervision, or discipline, not preventing excessive force and extrajudicial deaths by Tarrant County jailers and ratifying the wrongful conduct of jailers. The County, Tarrant County Judge O'Hare and the Commissioners had in fact delegated policy-making authority to Sheriff Waybourn and Executive Chief Deputy Eckert, giving them the responsibility for setting training policies and knew that there were training issues which resulted in the death of Johnson. As a result of the lack of training, supervision, discipline, lack of certification and the official customs and unconstitutional policies of the TCSO, TCJ remains at the top of the list in the state of Texas for in-custody deaths. The Defendant Jailers' inadequate training and the unconstitutional use of force policy were a moving cause in the death of Johnson. In fact, according to Defendant Garcia and other jailers, the County and the TCSO failed to properly supervise and train its jailers. According to TCSO jailers, the County did not provide adequate training regarding the proper use of pepper spray and the dangers associated with the misuse of the OC Spray, nor were they provided with any training regarding positional asphyxia, placing suspects in a constrictive prone position and/or identifying and treating suspects in medical distress. Despite the number of complaints lodged against the TCJ, Sheriff Waybourn and Executive Chief Deputy Eckert continue to cover-up bad acts and ratify the actions of its jailers.

68. The TCSO has received hundreds of complaints in the last year involving the use of excessive force by jailers, rarely taking any disciplinary action against the jailers. This has been the result of a systemic failure to supervise, discipline, counsel, or otherwise control jailers who are known or should be known to engage in the use of excessive force. The jailers know at the

time they act that their use of excessive and/or deadly force in conscious disregard of the rights and safety of innocent third parties will meet with the approval of the County's Policymakers. The Defendant Jailers are a part of "a code of silence" wherein other jailers and supervisors habitually cover[ed] up the use of excessive force by fabricating accounts to the media and in official reports and internal affairs investigations.

69. The TCSO continually failed to train its jailers adequately in the constitutional use of force, the proper use of pepper spray and caring for an individual after coming in contact with OC spray, prohibiting the placement of suspects in a prone position and preventing positional asphyxia, despite knowing of the need to do so and the dangers associated with not receiving training. In sum, the County's training and policy failures caused Defendants Moreno, Simmons, Marez, Nymoen, Caldwell, Moody, Nobles, Hollie, Sanchez, Stubbs, Gill, Pitcock, Longo and Russ to use excessive deadly force that was unjustified by the circumstances and thereafter the failure to render aid, in violation of the Fourth and Eighth Amendment rights of Johnson —a moving force behind the constitutional injuries Johnson suffered.

70. The TCSD did not provide adequate training to the Defendant Jailers in the use of deadly force and the use of non-deadly force. Plaintiffs charge the County with two unwritten policy failures. First, the County has failed to adopt any policy guiding TCSD jailers how to prevent positional asphyxia when it involves a suspect in medical distress. Second, the TCSD inadequately trained or supervised its jailers in how to safely use pepper spray, including the excessive usage of pepper spray and prohibited areas of the suspect's body not to contact, and in the constitutional limits on the use of force. The direct result of the County's failures was that Defendants Moreno, Simmons, Marez, Nymoen, Caldwell, Moody, Nobles, Hollie, Sanchez,

Stubbs, Gill, Pitcock, Longo and Russ used objectively unreasonable—and deadly—force against an unarmed, non-threating citizen.

71. The TCSO did not provide adequate training to the Defendant Jailers on proper confrontation techniques, de-escalation of force and use of force. It is well-settled that "a municipality's failure to train its employees can without question give rise to § 1983 liability." *World Wide St. Preachers Fellowship v. Town of Columbia*, 591 F.3d 747, 755 (5th Cir. 2009); *Peterson v. City of Fort Worth, Tex.*, 588 F.3d 838, 849 (5th Cir. 2009). Liability under this theory arises where the officers' assigned duties make "the need for more or different training [] so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989).

72. A single incident of a violation, such as Johnson's egregious death, "accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, could trigger municipal liability." *Bryan Cty.*, 520 U.S. at 409; *see also Piotrowski*, 237 F.3d at 579; *Alvarez*, 904 F.3d at 390. "The high degree of predictability may also support an inference of causation—that the municipality's indifference led directly to the very consequence that was so predictable." *Bryan Cty.*, 520 U.S. at 409–410. The defendants knew or should have known that the training was inadequate or nonexistent. The manner in which Johnson died was due to the County's failure to train the Defendant Jailers. The actions of Moreno, Simmons and Moody, and the Defendant Jailers' failure to intervene, were clear violations of the law and Johnson's constitutional rights.

73. Johnson posed no threat of imminent danger of death or great bodily harm to the Defendant Jailers or any other person in the immediate area.

74. The Defendant Jailers' unlawful and unwarranted acts, lack of training and the official customs or policies of the TCSD caused Johnson's wrongful death.

75. Plaintiffs would also show that at all times material hereto, the Defendant Jailers were acting under the color of law when they caused the injuries to Johnson.

76. Plaintiffs would further show that the Defendant Jailers' actions were the result of, or within the scope of, wrongful and reckless customs, policies, practices and/or procedures of the TCSD in regard to the use of deadly force for which the County and the Policymakers, specifically, County Judge O'Hare and Sheriff Waybourn knew or should have known but never provided the requisite and proper training.

77. Moreover, no reasonably competent official would have concluded that the actions of the Defendant Jailers described herein would not violate Johnson's constitutional rights. In other words, no reasonably prudent jailer under similar circumstances could have believed that the Defendant Jailers' conduct was justified nor was the treatment of Johnson reasonable.

78. Rather than implement policies and procedures to curtail death and/or injuries that result from the improper use of deadly force, the TCSD has failed to implement written policies and provide adequate training to its jailers.

79. Johnson was thirty-one (31) years old when the Defendants caused his tragic death. Johnson was in good health, with a reasonable life expectancy of living at least 48 more years to age 79.

80. The Plaintiffs have suffered pecuniary losses from the death of their son by virtue of the destruction of the parent-child relationship, including the right to love, affection, solace, comfort, companionship, society, emotional support, and happiness. The Plaintiffs will suffer anguish, grief, and sorrow as a result of Anthony's death and are likely to continue to suffer for a

long time in the future. The closeness of Plaintiffs' relationship with Anthony is demonstrated in many ways including the time they spent together, and the things Anthony did for his parents and siblings. For these losses, the Plaintiffs seek damages in a sum in excess of the minimum jurisdictional limits of the court.

## V.
## CAUSES OF ACTION

**A. Cause of Action against Moreno, Simmons, Marez, Nymoen, Caldwell, Moody, Nobles, Hollie, Sanchez, Stubbs, Gill, Longo, Pitcock and Russ under 42 U.S.C. §1983 for violation of Johnson's Fourth and Eighth Amendment Right to be free from excessive force.**

81. Plaintiffs incorporate by reference paragraphs 1 through 80 as if fully set forth herein. Plaintiffs would show that Defendants Moreno, Simmons, Marez, Nymoen, Caldwell, Moody, Nobles, Hollie, Sanchez, Stubbs, Gill, Longo, Pitcock and Russ's actions on the occasion in question were excessive and wrongful in depriving Johnson of his clearly established constitutional rights and was not objectively reasonable under the circumstances as alleged more fully below.

82. Plaintiffs would show that at all times material hereto, Defendants Moreno, Simmons, Marez, Nymoen, Caldwell, Moody, Nobles, Hollie, Sanchez, Stubbs, Gill, Longo, Pitcock and Russ had a duty to avoid infliction of unjustified bodily injury to Johnson, to protect his bodily integrity and to not trample on his constitutional rights, including the right to be free from the use of excessive force.

83. Plaintiffs would show that Defendants Moreno, Simmons, Marez, Nymoen, Caldwell, Moody, Nobles, Hollie, Sanchez, Stubbs, Gill, Longo, Pitcock and Russ failed to act as an objective jailer would have acted when faced with the same or similar circumstances. That is, Defendants Moreno, Simmons, Marez, Nymoen, Caldwell, Moody, Nobles, Hollie, Sanchez,

Stubbs, Gill, Longo, Pitcock, and Russ, without justification and the need to do so, forcefully wrestled Johnson to the ground where they punched and kicked Johnson and slammed his head to the ground. Defendant Simmons and Moody, for no lawful or justifiable reason, discharged pepper spray directly into Johnson's mouth and face causing serious harm and contributing to Johnson's death. Defendants Simmons, Marez, Nymoen, Caldwell, Moody, Nobles, Hollie, Sanchez, Stubbs, Gill, and Pitcock were on top of Johnson, using their bodyweight, restricting Johnson's breathing. After placing Johnson in handcuffs, Defendant Moreno was summoned to pin his knee in Johnson's back and neck for approximately 90 seconds, while Defendants Marez and Nymoen held Johnson down, until Johnson became nonresponsive. Johnson advised the Defendant Jailers at least twice that he could not breathe, signaling respiratory distress, but not one of the Defendant jailers attempted to push Moreno off of Johnson to assist Johnson. In fact, Defendant Garcia, instead of intervening, recorded the egregious act on a cell phone. Johnson was not attempting to harm or attack anyone when Defendant Moreno made the decision to pin his knee in Johnson's back as Defendants Marez and Nymoen held Johnson's legs. Defendants Simmons, Marez, Nymoen, Caldwell, Moody, Nobles, Hollie, Sanchez, Stubbs, Gill, and Pitcock's use of excessive force and Simmons and Moody's improper use of the pepper spray, coupled with placing and leaving Johnson in a prone position that made it difficult to breathe, was a moving force in Johnson's injuries and subsequent death.

84. The excessive force used by Defendants Simmons, Marez, Nymoen, Caldwell, Moody, Nobles, Hollie, Sanchez, Stubbs, Gill, Longo, Pitcock and Russ was not applied in a good-faith effort to maintain or restore discipline but was applied maliciously and sadistically to cause Johnson harm. Defendants Simmons, Marez, Nymoen, Caldwell, Moody, Nobles, Hollie, Sanchez, Stubbs, Gill, Longo, Pitcock and Russ's actions were not objectively reasonable because

they followed a procedure designed to inflict excessive force and bodily injuries in restraining individuals in a non-life-threatening situation.

85. Further, Defendants Moreno, Simmons, Marez, Nymoen, Caldwell, Moody, Nobles, Hollie, Sanchez, Stubbs, Gill, Longo, Pitcock and Russ's conduct violated a clearly established constitutional right—the right to be free from excessive force—that was established well before they injured Johnson. At the time of the incident, the law of the Fifth Circuit was clearly established that using pepper spray for the sole purpose of punishment or the infliction of pain, as Defendants Simmons and Moody did, is a violation of the Eighth Amendment. It is clearly established that no amount of force may be used against a person who poses no threat to the officers during the course of an arrest is an unconstitutional exercise of excessive force. *See Ramirez v. Martinez*, 716 F.3d 369, 379 (5th Cir. 2013) ("Here, Ramirez alleged he posed no threat to the officers and yet was tased twice, including once after he was handcuffed and subdued while lying face down on the ground, in violation of clearly established law."). More specifically, the use of pepper spray on a person who is not a threat to the officer, is not attempting to flee, and is following commands, is a violation of that person's constitutional rights. *Massey v. Wharton*, 477 F. App'x 256, 264 (5th Cir. 2012).

86. The force used by Defendants Simmons, Marez, Nymoen, Caldwell, Moody, Nobles, Hollie, Sanchez, Stubbs, Gill, Long, Pitcock and Russ was unnecessary and unreasonable under the circumstances, as Johnson, who was not attempting to harm anyone and pleading to the Defendant jailers that he could not breathe and was in respiratory distress, did not require the use of such excessive force.

87. A pretrial detainee's claim of excessive force is governed by the Fourteenth Amendment, which like the Fourth Amendment, declares the use of force excessive when it is

objectively unreasonable. *Austin v. City of Pasadena*, 74 F.4th 312, 322 (5th Cir. 2023). Courts weight the following factors to determine whether the use of force is reasonable: (1) the relationship between the need for the use of force and the amount of force used; (2) the extent of the plaintiff's injury; (3) any effort made by the officer to temper or to limit the amount of force; (4) the severity of the security problem at issue; (5) the threat reasonably perceived by the officer; and (6) whether the plaintiff was actively resisting. *Id.* (quoting *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015).

88. The need for force determines how much force is constitutionally permissible. *Timpa v. Dillard*, 20 F.4th 1020, 1028 (5th Cir. 2021). At one end of the spectrum, a threat of serious physical harm, either to the officer or others, may justify the use of deadly force. *Id.* (citing *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)). At the other end, when a subject has been subdued—meaning he "lacks any means of evading custody" and does not pose a threat of immediate harm—the further use of force is not justified. *Id.* at 1029 (citing *Josheph ex rel Est. of Joseph v. Bartlett*, 981 F.3d 319, 328 (5th Cir. 2020)). For cases in between, a court should consider the "totality of the circumstances. *Id.*

89. Defendants Moreno, Simmons, Marez, Nymoen, Caldwell, Moody, Nobles, Hollie, Sanchez, Stubbs, Gill, Longo, Pitcock and Russ's use of excessive force was objectively unreasonable. Johnson had not committed any penal offenses, was not resisting arrest, or attempting to flee when Defendants Simmons, Marez, Nymoen, Caldwell, Moody, Nobles, Hollie, Sanchez, Stubbs, Gill, and Pitcock repeatedly punched and kicked Johnson and kneed him after he had been violently slammed to the ground, and when Simmons and Moody discharged pepper spray into Johnson's mouth and face. Defendant Moreno pinned his knee on Johnson's back and neck for about 90 seconds preventing Johnson from breathing. It is clearly established that where,

like here, Johnson never engaged in any violent conduct and was restrained and subdued, the officers placement of Johnson in the prone position, after Simmons having sprayed pepper spray into Johnson's mouth, and Moreno kneeling on Johnson's back and neck for ninety seconds constituted excessive, unreasonable force. *See Fairchild v. Coryell Cty.*, 40 F.4th 359, 368 (5th Cir. 2022) ("continued use of bodyweight force to hold [the detainee] in the prone position after [she] was subdued" was unreasonable); *Timpa*, 20 F.4th at 1036 (citing cases that support the proposition that the "continued use of bodyweight force to hold [detainee] in the prone position after he was subdued and restrained" is objectively unreasonable).

90. As a direct and proximate cause of the incident as set forth herein, Johnson incurred extreme pain, injuries and his death for which Plaintiffs seek compensation as set forth more specifically in the section of this Complaint entitled "Damages."

**B. Cause of Actions against the County under 42 U.S.C. § 1983 for violation of the Plaintiffs' Fourteenth Amendment Rights.**

91. The County is liable for all damages suffered by the Plaintiffs pursuant to *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658 (1978) and 42 U.S.C. § 1983, based on an official policy or custom of the Tarrant County Sheriff's Department of which the Commissioners, County Judge O'Hare, Sheriff Waybourn and former Executive Chief Deputy Eckert all had actual or constructive knowledge that was a moving force behind the constitutional violations alleged herein.

**1. The County's written policies on the use of force are facially unconstitutional and were a moving force behind violating Johnson's constitutional right to be free from excessive force.**

92. The Plaintiffs incorporate paragraphs 1 through 91 as if fully set forth herein. Prior to the incident, the County and its Policymakers,' specifically Sheriff Waybourn and former

Executive Chief Deputy Eckert knew of the excessive use of force being used by Tarrant County Jailers but did nothing to curtail it, including updating the use of force policy.

93. The TCSO's outdated policies on the use of force does not adequately instruct officers on the degree of force that is objectively reasonable even when based on the officers' subjective evaluation and that officers may even use deadly force when no immediate threat of harm actually exists. Because both policies directly contradict what the United States Supreme Court has determined are the constitutional limits of the use of force, the policies on the use of force are facially unconstitutional.

94. Deadly force is not justified "[w]here the suspect *poses no immediate threat* to the officer and no threat to others." *Cole*, 935 F.3d at 453 (emphasis added) (quoting *Garner*, 471 U.S. at 11). The United States Supreme Court has not interpreted the constitution to justify using deadly force when the officer simply believes that a threat exists, even if the belief is reasonable. Thus, unless the suspect <u>actually poses</u> an <u>immediate</u> threat, the officer's <u>belief</u> that a suspect posed a threat alone does not justify using deadly force. A policy that instructs officers that they may use deadly force when they reasonably believe a threat exists, regardless of whether the threat actually exists and regardless of whether the threat is immediate, violates the constitutional limits on the use of force.

95. Furthermore, the United States Supreme Court has concluded that the objective "'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene"—not based on the particular officer's subjective evaluations. *Graham*, 490 U.S. at 396. Thus, in determining what degree of force is appropriate, officers may not consider subjective criteria, such as their own age, size, strength, skill level with department weapons, or

state of health. A policy that defines "objective reasonableness" to include such subjective criteria, therefore, violates the constitutional limits on the use of force.

96. Policies that ignore the United States Supreme Court's interpretation of the Constitution are facially unconstitutional. *See Monell*, 436 U.S. 658. The TCSO's unwritten policies on the use of force instruct officers that the degree of non-deadly force is objectively reasonable even when based on the officers' subjective evaluation and that officers may even use deadly force when no immediate threat of harm actually exists. Because both policies directly contradict what the United States Supreme Court has determined are the constitutional limits of the use of force, the policies on the use of force are facially unconstitutional.

97. Defendants Moreno, Simmons, Marez, Nymoen, Caldwell, Moody, Nobles, Hollie, Sanchez, Stubbs, Gill, Longo, Pitcock and Russ acted on the County's facially unconstitutional polices on the use of force when they used excessive deadly force against Johnson, causing his death. Defendant Moreno used a tactic on Johnson, pinning his knee into an inmate's back and using his bodyweight to restrict movement, which he was trained to do. Specifically, because of his weight, Moreno was trained and instructed to use his knee to pin suspects to the ground, which restricted their movement and breathing. Defendants Moreno, Simmons, Marez, Nymoen, Caldwell, Moody, Nobles, Hollie, Sanchez, Stubbs, Gill, Longo, Pitcock and Russ were unjustified in using excessive force against Johnson because he did not pose any actual, immediate threat to the jailers or others. Punching, choking, discharging pepper spray into Johnson's mouth, using bodyweight force, and Defendant Moreno using his knee to pin Johnson to the ground, while Johnson was in a prone position in handcuffs, on nothing more than Defendants Moreno, Simmons, Marez, Nymoen, Caldwell, Moody, Nobles, Hollie, Sanchez, Stubbs, Gill, Longo, Pitcock and Russ's subjective perception of danger—as the TCSO's use of force policies unconstitutionally

instruct officers they may—was objectively unreasonable and violated the Fourth and Eighth Amendment rights of Johnson. Therefore, the TCSO's use-of-force policies were moving forces behind Plaintiffs' constitutional injuries.

**2. The County and the TCSD failed to train its jailers to avoid using deadly force, and even trained officers to use deadly force where no immediate risk of harm existed.**

98. Plaintiffs incorporate by reference paragraphs 1 through 97 as if fully set forth herein. Prior to April 21, 2024, the Policymakers, specifically, Tarrant County Judge O'Hare, Sheriff Waybourn, former Executive Chief Deputy Eckert, and the Tarrant County Commissioners knew or should have known that the Defendant Jailers exhibited a pattern of escalating encounters with the inmates. The Policymakers were aware that Defendant Moreno was trained to use the technique he performed on Johnson although it created a high degree of risk. The Policymakers, specifically Sheriff Waybourn and former Executive Chief Deputy Eckert, knew that the Defendant Jailers and the County Jailers were not receiving the required certification to use and/or carry pepper spray. Sheriff Waybourn was aware of other incidents involving the improper use of pepper spray but did not take any action to prevent the improper use of pepper spray.

99. Defendants Moreno, Simmons, Marez, Nymoen, Caldwell, Moody, Nobles, Hollie, Sanchez, Stubbs, Gill, Longo, Pitcock and Russ were acting under the color of law and acting pursuant to customs, practices and policies of the County and the TCSD in regards to the use of excessive and deadly force as authorized and/or ratified by the Policymakers, specifically Sheriff Waybourn when they deprived Johnson of rights and privileges secured to him by the Fourth Amendment to the United States Constitution and by other laws of the United States, by the County and the TCSD failing to provide proper training in the use of deadly in violation of 42 U.S.C. § 1983 and related provisions of federal law and in violation of the above cited constitutional

provisions.

100. With respect to the claims made the basis of this lawsuit, the County failed to adequately train and supervise its jailers regarding the unnecessary use of deadly force and the proper use of paper spray as confirmed by multiple sources, including the Commissioners. The failure to train, supervise or discipline its employees in a relevant respect reflects a deliberate indifference to the County, TCSO, Tarrant County Judge O'Hare, the Commissioners, Sheriff Waybourn and former Executive Chief Deputy Eckert to the rights of the County's inhabitants and is actionable under 42 U.S.C. § 1983.

101. The County, TCSO, Sheriff Waybourn and former Executive Chief Deputy Eckert under the direction of the Tarrant County Commissioners and Tarrant County Judge O'Hare developed and maintained a policy of deficient training of its jailers in the use of force, including the use of deadly force in the apprehension and the wrongful detention of inmates.

102. The County, TCSO, Sheriff Waybourn and former Executive Chief Deputy Eckert's failure to provide adequate training to its jailers regarding the use of deadly force, the proper use of pepper spray and wrongful arrest/detentions reflect deliberate indifference by the Policymakers and reckless and conscious disregard for the obvious risk that jailers would use excessive or deadly force on inmates and made the violations of Johnson's constitutional rights, including his death, a reasonable probability.

103. Plaintiffs would show that Defendants Moreno, Garcia, Simmons, Marez, Nymoen, Caldwell, Moody, Nobles, Hollie, Sanchez, Stubbs, Gill, Longo, Pitcock and Russ's actions were the result of, or within the scope of, wrongful and reckless customs, policies, practices and/or procedures for which the County, TCSO, Sheriff Waybourn and former Executive Chief Deputy Eckert knew or should have known but never provided the requisite and proper training.

104. On information and belief, the County, TCSO, Tarrant County Judge O'Hare, Sheriff Waybourn and former Executive Chief Deputy Eckert, acting through official policies, practices, and customs, and with deliberate, callous, and conscious indifference to the constitutional rights of Johnson, failed to implement and/or enforce the policies, procedures; and practices necessary to provide constitutionally adequate protection and assistance to Johnson during his struggle to survive and implemented policies, procedures, and practices which actually interfered with or prevented with or prevented Johnson from receiving the protection, assistance and care he deserved.

105. For instance, the following conduct, policies, and customs, *inter alia*, by Defendants violated Johnson's constitutional rights:

(a) The inadequacy of TCSO's policies, training, supervision, or discipline relating to the use of deadly force;

(b) The inadequacy of TCSO's policies, training, supervision, or discipline relating to the use of non-lethal control devices and tactics;

(c) The inadequacy of TCSO's policies, training, supervision, or discipline relating to positional asphyxia;

(d) The inadequacy of TCSO's policies, certification, training, supervision, or discipline relating to the proper use of pepper spray;

(e) The inadequacy of TCSO's policies, training, supervision, or discipline relating to placing a suspect in a constrictive prone position for a period of time;

(f) The adoption of completely subjective continuum of force policy that can be expressly avoided, and which leaves the use of deadly force exclusively to the unchecked discretion of jailers on the scene;

(g) The adoption of a policy that allows officers to use the degree of force that the officer feels brings the situation quickly under control as per his or her individual judgment even if that method is deadly force;

(h) Lack of training regarding effective communication with inmates while giving them commands and determining their compliance;

(i) Lack of training regarding inmates with a mental illness;

(j) Lack of training regarding positional asphyxia, one of the causes of Johnson's death;

(k) Lack of training regarding the impact of placing a suspect in a constrictive prone position;

(l) Lack of training identifying a suspect in medical and/or respiratory distress and the need to provide immediate medical attention;

(m) Lack of training reducing the chances of injury or death of individuals related to Oleoresin capsicum (OC) spray;

(n) Using excessive and/or deadly force against Johnson although he caused no immediate threat; and

(o) Using the knee and bodyweight to pin an inmate to the ground, while in a constrictive prone position.

106. In addition, Defendant Tarrant County, as applicable, failed and refused to implement customs, policies, practices, or procedures, and failed to train its personnel adequately on the appropriate policies, practices, or procedures regarding the use of deadly force, use of a pepper spray and what to do when someone comes in contact with it, positional asphyxia, dealing with mental illness and the wrongful detention of individuals. The County had not revised or updated its standard operating procedures since 2009. In so doing, Defendant Tarrant County knew that it was acting against the clear dictates of current law and knew that as a direct consequence of its deliberate decisions, the very situation that occurred -- *i.e.*, Johnson's death-- in all reasonable probability would occur.

107. The County's failure to properly train, supervise and discipline its jailers regarding the use of force and rendering medical aid, was the proximate cause of the violations of Johnson's constitutional rights including the unnecessary taking of Johnson's life.

108. It is clearly established law that Defendants Moreno, Garcia, Simmons, Marez,

Nymoen, Caldwell, Moody, Nobles, Hollie, Sanchez, Stubbs, Gill, Longo, Pitcock and Russ's decision to use excessive force against an unarmed, unthreatening man not suspected of any crime is a Fourth Amendment violation which was plainly foreseeable to the County when it failed to adequately train its jailers. *See, e.g., Brosseau v. Haugen*, 543 U.S. 194, 197 (2004). The Supreme Court has explained that the need for this training, which at least one of the Defendant jailers admits he was not provided, is "so obvious" that even a single incident is sufficient to show "deliberate indifference" on the part of the municipality.

**3. The County failed to adequately supervise or discipline its jailers for violent, aggressive, excessive force and wrongful arrest and detention and, in failing to do so, ratified and encouraged the conduct of its jailers, including the Defendant Officers.**

109. Plaintiffs incorporate by reference paragraphs 1 through 108 as if fully set forth herein.

110. On Plaintiffs' governmental liability claim against the County for failing to supervise and/or discipline its jailers for prior violations and the resulting lack of supervision:

a. the County, Sheriff Waybourn and former Executive Chief Deputy Eckert failed to adequately supervise and/or discipline its employees in handling usual and recurring situations with which they deal;

b. Sheriff Waybourn and former Executive Chief Deputy Eckert were deliberately indifferent to the need to supervise and/or discipline its jailers and/or employees adequately;

c. the failure to adequately supervise and/or discipline its jailers proximately caused the deprivation of Johnson's constitutional rights; and

d. the County, Sheriff Waybourn and former Executive Chief Deputy Eckert failed to adequately supervise and/or discipline Defendants Simmons, Marez, Nymoen, Caldwell, Moody, Nobles, Hollie, Sanchez, Stubbs, Gill, Longo, Pitcock and Russ for their wrongful actions. In fact, it was determined that the Pepper Spray used by Defendant Simmons was a contributing cause of Johnson's death but there were no consequences for Simmons' unlawful actions. Simmons and other jailers were not adequately disciplined for knowingly smuggling illegal contraband into the TCJ. Additionally, Defendants Simmons, Marez, Nymoen, Caldwell, Moody, Nobles,

Hollie, Sanchez, Stubbs, Gill, Pitcock and Russ held Johnson down while Defendant Moreno used his knee to pin Johnson to the ground, while in a constrictive prone position. Additionally, the Defendant Officers ignored Johnson's multiple pleas that he could not breathe and did nothing to prevent Johnson's death although they were in a position to do so.

111. Despite having knowledge of the Defendant Jailers' violation of the TCSO's policies and other best police practice as described above, the County and Sheriff Waybourn refused to adequately discipline any of the Defendant Officers, other than Garcia and Moreno. The County's Policymakers were aware of the out-of-control behavior of the Defendant Jailers' prior actions and/or injurious behavior but failed to take any actions. The County's failure to adequately supervise and/or discipline its jailers was therefore the moving force behind Plaintiffs' damages.

112. This failure to discipline or supervise and after-the-fact ratification was indicative of the County's unwritten policy of supporting employees in using unconstitutional excessive force or violating the law.

113. The County's after-the-fact ratification shows that the County supported these unconstitutional uses of force at the time they occurred.

114. Evidence of this nature tends to imply that the County and Sheriff Waybourn may have affirmatively acquiesced in, adopted and/or sanctioned the Defendant Jailers' conduct and failed to actively enforce the TCSP's own policies and procedures.[29] It also tends to suggest that it and/or other policymakers found no inadequacies in the jailers' level of training. Such affirmative official action lends itself to the possibility of recurring situations that present the potential for constitutional rights' violations.

115. When the County, the Commissioners, Sheriff Waybourn and Executive Chief

[29] Sheriff Waybourn attempted to cover for Garcia and Moreno until information about the case was leaked to the Public. Initially, Sheriff Waybourn told the Plaintiffs that Johnson died at the hospital due to a medical emergency caused by pepper spray.

Deputy Eckert failed and refused to discipline Defendants Simmons, Marez, Nymoen, Caldwell, Moody, Nobles, Hollie, Sanchez, Stubbs, Gill, Longo, Pitcock and Russ for their clearly established constitutional violations, they approved of and ratified the Jailers' conduct, which itself establishes a custom of the TCSD. *See World Wide St. Preachers Fellowship v. Town of Columbia*, 591 F.3d 747, 755 (5th Cir. 2009).

116. When a municipality approves a subordinate's conduct and the basis for it, liability for that conduct is chargeable against the municipality because it has "retained the authority to measure the official's conduct for conformance with their policies." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (plurality opinion); *Groden v. City of Dallas*, 826 F.3d 280, 284 (5th Cir. 2016); *see also Balle v. Nueces Cty., Tex.*, 690 F. App'x 847, 852 (5th Cir. 2017). Under *Praprotnik*, "post hoc ratification by a final policymaker is sufficient to subject a city to liability because decisions by final policymakers are policy."

117. The County, the Commissioners, Sheriff Waybourn and Executive Chief Deputy Eckert have a history of refusing to investigate jailers for using excessive force or violating numerous laws. In fact, they repeatedly conducted sham internal investigations under a conflict of interest and ignored their jailers' uses of excessive force and other violations, including smuggling illegal contraband into the TCJ. This custom of failing to discipline officers for violent, discriminatory behavior led to the use of excessive force against Johnson.

118. The failure of the County or the TCSO to punish the Defendant Jailers or to make any reasonable attempt to implement meaningful changes in light of Johnson's injuries emphasizes the point – this is how things have always been done. This "incompetent and catastrophic performance" resulted in no disciplinary action, no retraining, and no reevaluation of policies by the County and the TCSO. Rather, the County, the Policymakers, Sheriff Waybourn, former Executive

Chief Deputy Eckert and the TCSO ratified the Defendant Jailers' conduct.

119. This after-the-fact ratification and failure to supervise or discipline is indicative of an unwritten policy supporting jailers in using unconstitutional excessive force. *See World Wide St. Preachers Fellowship v. Town of Columbia*, 591 F.3d 747, 755 (5th Cir. 2009) (ratification of an obvious violation of clearly established law is sufficient to establish an unofficial policy or custom). When the County and the TCSO failed and refused to discipline all of the Defendant Jailers for their clearly established constitutional violations, they approved and ratified the jailers' conduct, which itself establishes a custom of the TCSO. *World Wide St. Preachers Fellowship*, 591 F.3d at 755.

120. As a result of these Constitutional violations to Johnson and the injuries he sustained, Plaintiffs seek compensation as set forth more specifically in the section of this Complaint entitled "Damages."

**C. Cause of Action against the County for Deliberate Indifference to the Medical Needs of Johnson. Violation of the Eighth Amendment Pursuant to 42 U.S.C. § 1983**

121. Plaintiffs repeat and re-allege each and every allegation contained in Paragraphs 1–120 as if fully repeated herein.

**1. Defendant Tarrant County had no apparent policies or procedures for providing inmates adequate medical care, let alone for providing adequate mental health care specifically.**

122. Although other counties in Texas have established "policies and procedures for providing mental health care to pretrial detainees and inmates," Defendants have provided the Plaintiffs with no such policy or procedure enacted by Tarrant County, and Plaintiffs have otherwise been unable to locate them from publicly available sources.

123. Defendant Tarrant County had no apparent policy for ensuring that inmates generally—or inmates with mental illnesses—received adequate treatment for their medical needs,

as required by the U.S. Constitution. The Defendant had no apparent policy that instructs its employees on the process for monitoring the health of inmates with serious medical conditions, let alone how to deal with inmates who are in medical distress or suffering from a mental illness. The County had no policy on the impact of pepper spray or pepper spray safety although it has been a problem at the TCJ.

**2. Rather, Defendant had a *de facto* policy of deliberate indifference to the medical needs of inmates, including Mr. Johnson.**

***Defendant knew of incidents forming a pattern of providing inadequate treatment for the medical needs of inmates and of the need for policies to remedy that failure.***

124. Defendant, Tarrant County, neglected the medical needs of inmates and had a track record of doing so, as is evident from more than (60) reported prior deaths of inmates receiving inadequate medical treatment for their medical needs and/or victims of excessive force—a widespread and longstanding pattern of misconduct that violates the inmates' Eighth and Fourteenth Amendment rights. Further, the newspaper articles about (1) the inadequate medical care inmates were receiving in the TCJ, (2) the letter by community organizations being ignored, and (3) concerns regarding the professional competency of certain medical employees at the TCJ, coupled with the Texas Commission on Jail Standards Investigation into possible constitutional violations and lawsuit against the County, indicate that additional other incidents also exist that contribute to this widespread and longstanding pattern.

***The Defendant had constructive and actual knowledge of this pattern and the substantial risk of serious harm that existed and was deliberately indifferent to it.***

125. Defendant, Tarrant County, had actual knowledge of the pattern of inmates receiving inadequate treatment for their medical needs or being subjective to cruel and unusual punishment, based on discussions at the County's Commissioners' meetings, prior lawsuits, court rulings and based on prior receipt of written information from direct communications from inmates

or others acting on their behalf, that inmates were being abused and/or receiving inadequate medical treatment and failed to remedy the inadequacy. The inmates and former employees of the County disclosed the corruption taking place under Sheriff Waybourn that is covered up by the County and the Commissioners.

126. At a minimum, Defendant had constructive knowledge of the pattern and risk that it would have known of the violations if it had properly exercised its responsibilities—particularly evident from the fact that the violations were so persistent and widespread that they have been the subject of prolonged public discussion or of a high degree of publicity. Defendant received constructive notice that inmates were not receiving adequate medical treatment via newspaper articles, complaints and an investigation—and resulting legal actions—initiated by inmates.

127. "[D]eliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment" and states a claim under Section 1983. *Estelle v. Gamble,* 429 U.S. 97, 104 (1976) (cleaned up). "[P]roviding an inmate with inadequate psychiatric care could violate the inmate's eighth amendment right." *Greason v. Kemp*, 891 F.2d 829, 834 (11th Cir. 1990).

128. Deliberate indifference exists when the official or officials refuse to treat an inmate, ignore medical complaints, or intentionally provide incorrect medical treatment. It was clearly established at the time that a prisoner has a constitutionally protected right to be free from a prison official's deliberate indifference to a prisoner's serious medical needs.

129. Since at least 2017, Defendant has known of a widespread, longstanding pattern of jail officials refusing to treat inmates, ignoring medical complaints, using excessive force or intentionally providing incorrect medical treatment resulting in over sixty deaths. And, considering that in a prior lawsuit brought in the Northern District of Texas, a federal judge

found that the documented allegations of deficient supervision, suspicious inmate deaths, and the highest mortality rate in North Texas are sufficient to "put a reasonable policymaker on notice about potential condition of confinement issues at the jail,"[30] it is reasonable to infer from these facts that Defendant knew of the serious risks of not enacting policies or procedures for ensuring that inmates received adequate medical care and protection. Moreover, the numerous published articles and public outcry about the inadequate medical care pattern, including knowledge that the Commissioners and the policymakers were briefed on the issues at the TCJ indicate that Defendant actually drew the inference that failing to enact the necessary policies and procedures would create a serious risk and continued Eighth Amendment violations. Nevertheless, by the time Mr. Johnson was incarcerated, Defendant still had done nothing to enact or implement policies to remedy this pattern of violations.

130. This deliberate indifference directly resulted in the failure to provide Johnson with the medical treatment he needed and adequate protection to be free from excessive force. The inadequate medical care Johnson received while in the TCJ was the natural result of Defendant failing to correct the practice of not providing inmates with adequate treatment and protection. The Defendants knew Johnson was in extreme medical distress and needed medical attention and were required to alert medical personnel but deliberately chose to ignore Johnson in violation of Johnson's Eight Amendment constitutional rights.

[30] Memorandum Opinion & Order, ECF No. 61, at 27-28, *Congious v. City of Fort Worth et al.*, Docket No. 4:22cv-00092 (N.D. Tex. Mar. 31, 2023).

**3. Defendant's failure to remedy its *de facto* policy or to enact or implement a policy to provide inmates adequate medical treatment caused Johnson's suffering and death.**

***Defendant had constructive and actual knowledge of the substantial risk of serious harm to Johnson.***

131. The Defendant was also aware of and ignored obvious indicia of a risk of serious harm to Johnson specifically, including but not limited to, the fact that Johnson advised the Defendant Jailers multiple times that he could not breathe and was in respiratory distress, that his body was limp, and he could not stand or walk. Thus, the Defendants were aware of facts from which the inference could be drawn that a substantial risk of serious harm existed.

132. The Defendants actually drew this inference because it acknowledged Johnson's medical issues. Furthermore, Defendants knew Johnson could not stand on his own and was nonresponsive. Further, the Defendants' actual knowledge of the substantial risk can be inferred because it was so obvious, and the need was so apparent that even laymen would recognize that care is required—as Johnson was no longer moving on his own. Thus, the Defendants actually drew the inference that a substantial risk of serious harm to Johnson existed.

133. Accordingly, at all times material hereto, Defendants were aware that Johnson was in a distress situation and was having difficulties breathing. Johnson advised the Defendant Jailers on multiple occasions that he could not breathe but was ignored. Johnson was foaming at the mouth. Defendants knew of Johnson's medical needs but failed to and/or refused to provide Johnson with the required care. Defendants' failure to provide Johnson with timely medical attention and to alert medical personnel resulted in Johnson's death.

***Defendants' failure to provide Johnson adequate treatment for his serious medical needs, resulted in deliberate indifference to the substantial risk of serious harm to him, directly caused his suffering and death.***

134. Consistent with its failure to implement a current medical policy, including the

prohibition against positional asphyxia and the impact of pepper spray and treatment after impact, TCJ violated 42 U.S.C. § 1983 when its governmental officials acted or failed to act with subjective deliberate indifference to Johnson's serious medical needs.

135. Johnson had a constitutional right to medical care under the Eighth Amendment while in Defendant's custody. Refusing to treat a prisoner's complaints can give rise to Section 1983 liability.

136. Defendants failed to follow proper medical guidelines by refusing to get Johnson the needed attention after he had been assaulted and was in respiratory distress. Despite Defendants being aware that Johnson required medical attention, Johnson's pleas for help were ignored by the Defendants.

137. Accordingly, the Defendants were deliberately indifferent to Johnson's health and safety because they refused to treat him or otherwise disregarded his serious medical needs by not providing first aid or summoning *immediate* medical care for Johnson after he was injured by the Defendant Jailers while Defendant Garcia recorded the incident.

138. Failing to promptly call for emergency assistance in the face of known, serious medical emergencies violate the Constitution. The Defendants knew Johnson faced a substantial risk of serious medical harm and failed to take reasonable measures to abate that risk. Instead of assisting Johnson, they allowed Johnson to experience a slow and painful death.

139. Defendants' refusal to treat Johnson and ignoring his condition were acts of subjective deliberate indifference that caused an unconstitutional delay in medical treatment which contributed to Johnson's death.

140. The Eight Amendment guarantees arrestees/detainees a right "not to have their serious medical needs met with deliberate indifference on the part of the confining officials. *Id.*

141. Johnson had a constitutional right to medical care under the Eighth Amendment while in the County's custody.

142. The County and the Defendant Jailers failed to follow proper medical guidelines by refusing to get Johnson the needed immediate attention, despite being aware that Johnson was in medical distress. Indeed, it was evident to any reasonable person who saw Johnson foaming at the mouth after being sprayed multiple times with pepper spray and hearing him scream he could not breathe as Defendant Moreno pinned his knee in Johnson's back with the assistance of the Defendant Jailers, that he was in a medical crisis. Additionally, seeing Johnson slumped over in the wheelchair he was placed in was an additional sign he needed help but none of the Defendant Jailers assisted Johnson. The Defendant Jailers did nothing to ensure that Johnson received medical treatment adequate to address his serious needs, consistent with the County's *de facto* policy of ignoring inmates' serious medical needs with deliberate indifference.

143. The County's failure to respond to its knowledge that inmates were receiving inadequate treatment in the TCJ resulted in the failure to provide Johnson with the medical treatment he needed. The inadequate medical care and inhumane treatment Johnson received while at the TCJ was the natural result of the County failing to correct the practice of not providing inmates with adequate treatment.

144. The County's refusal to treat Johnson after he had been assaulted and ignoring his repeated pleas and complaints were acts of subjective deliberate indifference that caused an unconstitutional delay in medical treatment which caused Johnson's death. As a direct result of the Defendants failing to provide first aide and immediate medical care and attention to Johnson, he suffered physical injury, pain, mental anguish, and death for which Plaintiffs sues herein.

145. These injuries were not caused by any other means.

146. Further, the Defendants' conduct violated a clearly established constitutional right under the Eighth Amendment. It was clearly established law at the time of the incident that failing to render aid or to call for emergency assistance in response to a serious threat to an inmate's life constitutes deliberate indifference. Therefore, when the jailer employees acted consistent with Defendant's *de facto* policy of ignoring inmates' serious medical needs with deliberate indifference, the policy became a direct cause—a moving force—of Johnson's suffering and death, in violation of his Eighth Amendment.

147. As a result of these Constitutional violations to Johnson, Plaintiffs seek compensation as set forth more specifically in the section of this Complaint entitled "Damages."

**D. Failure to Adequately Train or Supervise. Violation of the Eighth Amendment Pursuant to 42 U.S.C. § 1983.**

148. Plaintiffs repeat and re-allege each and every allegation contained in Paragraphs 1–147 as if fully repeated herein.

**1. Defendant Tarrant County's failure to train its employees to ensure inmates are provided adequate medical care and are free from excessive force caused Johnson's suffering and death.**

149. The Defendant directly caused the constitutional violations suffered by the decedent and is liable for the damages suffered as a result of the conduct of Defendant's employees or agents of TCJ. The conduct of the TCSO and its employees was a direct consequence of the policies and practices of the TCJ.

150. At all times relevant to this Complaint, Defendant TCJ, acting through its employees or agents, had policies, practices, customs, and usages of refusing to properly train, monitor, supervise, or ensure staff and agents utilized a proper protocol for protecting detainees with preexisting medical conditions by ignoring substantial risks of serious harm and failing to prevent harm to detainees.

151. As a result of the above-described policies and customs, TCJ's employees or agents believed that their actions or inaction would not be properly monitored by supervisory officers and that misconduct would not be investigated or sanctioned but would be tolerated.

152. TCJ failed to provide its employees with the proper training required to provide detainees with proper medical treatment, especially when the inmates suffered from a mental illness or a serious injury after being assaulted or in direct contact with pepper spray. TCJ did not have any adequate policies or training in place regarding the rendering of medical assistance to detainees in medical distress nor were jailers properly certified or trained in the proper use of pepper spray, reducing the chances of injury or death of individuals related to Oleoresin capsicum (OC) spray or placing an inmate in a prone position while applying body force . TCJ's failure to provide adequate training to its employees regarding the need to render proper medical treatment and/or attention to injured detainees reflects deliberate indifference by the Policymakers and reckless and conscious disregard for the obvious risk that made the violations of Johnson's constitutional rights, a reasonable probability.

153. For instance, the following conduct, policies, and customs, *inter alia*, by Defendant violated Johnson's constitutional rights:

a. Defendant's inadequate—or nonexistent—policies to train, supervise, or discipline its jailers/employees on protecting inmate health and safety;

b. Failing to institute a policy or any training for jailers/employees on how to monitor and ensure treatment for inmates suffering from serious health issues or a mental illness, including ensuring that such inmates are provided the medications prescribed for their conditions;

c. Failing to institute a policy or any training for jailers/employees on how to deal with individuals suffering with a mental illness, resulting in a lack of policies in place to limit the discretion of jailers/employees;

d. Failing to assure that its jailers are certified before being allowed to use pepper spray;

e. Failing to assure that its jailers are trained on the dangers associated with position asphyxia and the improper use of Oleoresin capsicum (OC) spray or reducing the chances of injury or death of individuals related to OC spray.

f. Lack of training regarding positional asphyxia, one of the causes of Johnson's death;

g. Lack of training regarding the impact of placing a suspect in a constrictive prone position;

h. Lack of training identifying a suspect in medical distress and the need to provide immediate medical attention; and

i. Using excessive and/or deadly force against Johnson although he caused no immediate threat.

154. These policies were moving forces behind the suffering and death of Johnson, which would not have occurred if Defendant had trained its jailers/employees: in how to protect inmate health and safety; in how to monitor inmates with serious health issues or mental health conditions like schizophrenia and bipolar disorder and ensure they received adequate treatment such as medications prescribed for those conditions; or in how to deal with individuals suffering with a mental illness so that they did not rely on their discretion. Further, the County provided no training on the impact of pepper spray and what to do when an inmate is sprayed at close

range.

155. TCJ and its employees knew of the risk of harm that they were enhancing by failing to provide medical treatment or by delaying such treatment.

156. The Defendants' delay in providing medical treatment reflects deliberate indifference by the Policymakers and reckless and conscious disregard for the obvious risk that made the violations of Johnson's constitutional rights a reasonable probability.

157. The wrongful policies, practices, customs, or usages complained of herein demonstrated a deliberate indifference on the part of the County, through its employees and agents, to the constitutional rights of persons needing medical care while in its custody and were the direct and proximate cause of the violations of Johnson's rights alleged herein.

158. Johnson's injuries, and ultimately his death, were caused in substantial part by these widespread policies, practices, and procedures promulgated by TCJ. These policies, practices, and procedures or lack thereof, were the cause of Johnson's death.

159. In addition, Defendant, Tarrant County Judge O'Hare, Sheriff Waybourn and the Commissioners, as applicable, failed and refused to implement customs, policies, practices or procedures, and failed to train its personnel adequately on the appropriate policies, practices or procedures dealing with individuals suffering with a mental illness or serious injury. In so doing, Defendant knew that it was acting against the clear dictates of current law and knew that as a direct consequence of their deliberate decisions, the very situation that occurred—*i.e.*, Johnson's death—in all reasonable probability would occur.

160. Defendant's failure to properly train, supervise, and discipline its employees/jailers regarding the use of excessive force, the proper use of pepper spray, and the proper monitoring and treatment of Johnson was a proximate cause of the violations of

Johnson's constitutional rights.

**2. Defendant's failure to supervise its employees to ensure inmates are provided adequate medical care caused Johnson's suffering and death.**

161. Additionally, in a Section 1983 claim for failure to supervise or train, the plaintiff must show: "either the supervisor's personal participation in the acts that comprise the constitutional violation or the existence of a causal connection linking the supervisor's actions with the violation." *Smith v. LePage*, 834 F.3d 1285, 1298 (11th Cir. 2016). A "causal connection can be established when facts support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." *Id.*

162. Defendant Garcia was the Lieutenant in charge of the jailers. Defendant Garcia failed to stop the Defendant Jailers from acting unlawfully. Defendant Garcia failed to intervene as Johnson pleaded for help.

163. The County and its policymakers were aware for decades that there was a persistent, widespread pattern of TCJ providing inmates inadequate medical care. The County and its policymakers were further aware of facts from which an inference could be drawn that a substantial risk of serious harm existed that inmates' Eighth Amendment rights would continue to be violated until it supervised its jailer/employees to ensure that they were providing inmates adequate medical treatment. But despite knowing that the jailer/employees would violate these inmates' rights, the County failed to stop them from doing so.

164. The County and its policymakers were further aware of facts from which an inference could be drawn that without adequately supervising the jailer/employees to ensure Johnson obtained adequate medical treatment and was free from the jailers' use of excessive force, Johnson specifically would face a substantial risk of serious harm. However, despite this

information, the Defendants did not summon medical personnel to ensure that Johnson was okay after he had been physically assaulted. And, despite knowing that the jailer/employees would violate Johnson's Eighth Amendment rights as a result, the County failed to stop them from doing so.

165. Consequently, the County was deliberately indifferent in failing to supervise its employees.

166. Finally, there existed a causal link between the County's failure to supervise and the violation of Johnson's rights. Had the County taken steps to ensure its employees or agents provided Johnson with immediate medical care instead of simply ignoring his complaints, Johnson would not have continued to suffer and ultimately died.

167. As a result of these Constitutional violations to Johnson, Plaintiffs seek compensation as set forth more specifically in the section of this Complaint entitled "Damages."

**E. Cause of Action against Defendants under 42 U.S.C. § 1983 in violation of Johnson's Eighth and Fourteenth Amendment rights.**

168. Plaintiffs incorporate by reference paragraphs 1 through 167 as if fully set forth herein. Plaintiffs would show that Defendants' actions on the occasion in question were wrongful in depriving Johnson of his constitutional rights, as alleged more fully below.

**1. Failure to render Medical Aid**

169. Plaintiffs would show that at all times material hereto, the Defendant Jailers were aware that Johnson was in a distress situation and was having difficulties breathing. Johnson advised the Defendant Jailers that he could not breathe but was ignored. The Defendant Jailers knew of Johnson's medical needs but failed to and/or refused to provide Johnson with the required care, including notifying competent medical personnel or providing Johnson with the required treatment after being affected by pepper spray. The Defendants' failure to provide Johnson with

timely medical attention resulted in Johnson's death.

**2. The denial of medical care to Johnson.**

170. The Defendant Jailers violated 42 U.S.C. § 1983 when they acted or failed to act with subjective deliberate indifference to Johnson's serious medical needs. Deliberate indifference exists when the official or officials refuse to treat Johnson, ignore medical complaints, or intentionally provide the incorrect medical treatment. It was clearly established at the time that a prisoner has a constitutionally protected right to be free from a prison official's deliberate indifference to a prisoner's serious medical needs. *See Easter v. Powell*, 467 F.3d 459, 465 (5th Cir. 2006).

171. The Fourteenth Amendment guarantees pretrial detainees a right "not to have their serious medical needs met with deliberate indifference on the part of the confining officials." *Dyer v. Houston*, 955 F.3d 501,506 (5th Cir. 2020) (citing *Thompson v. Upshur Cty*., Tex., 245 F.3d 447, 457 (5th Cir. 2001) (citing, inter alia, *Estelle v. Gamble*, 429 U.S. 97, 103 (1976))).

172. Johnson had a constitutional right to medical care under the Fourteenth Amendment while in Defendants' custody. Refusing to treat a prisoner's complaints can give rise to Section 1983 liability. *Galvan v. Calhoun Cty*., 719 F. App'x 372 (5th Cir. 2018); Easter v. Powell, 467 F.3d 459, 461-65 (5th Cir. 2006); *Harris v. Hegmann*, 198 F.3d 153, 159-60 (5th Cir. 1999); *Alderson v. Concordia Par. Corr. Facility*, 848 F.3d 415, 422 n.8. (5th Cir. 2017). An episodic-acts-or-omissions claim faults specific officials for their acts or omissions.

173. As to the individual in an episodic-acts-or-omissions claim, the relevant question becomes "whether that official breached his constitutional duty to tend to the basic human needs of persons in his charge." *Hare v. City of Corinth, Miss*., 74 F.3d 633, 645 (5th Cir. 1996).

174. An official's actual knowledge of a substantial risk may only be inferred if the

"substantial risk" was obvious. *Easter,* 467 F.3d at 463. Deliberate indifference is shown when a plaintiff properly alleges that officials "refused to treat him ... or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Domino,* 239 F.3d at 756 (quoting *Johnson v. Treen,* 759 F.2d 1236, 1238 (5th Cir. 1985)).

175. The Defendant Jailers failed to follow proper medical guidelines by refusing to get Johnson the needed medical attention. Despite being aware that Johnson required immediate medical attention, Johnson's obvious need for medical attention was ignored by the Defendants.

176. Defendants' refusal to treat Johnson were acts of subjective deliberate indifference that caused an unconstitutional delay in medical treatment which caused Johnson's death.

**3. The Defendant Jailers were aware of facts from which the inference could be drawn that a substantial risk of serious harm existed.**

177. The Defendant Jailers were aware of and ignored obvious indicia of a risk of serious harm, specifically including but not limited to, the facts that Johnson was unable to stand or walk, Johnson's breathing was labored, he told the Defendant Jailers that he could not breathe, he was foaming at the mouth, and he was contaminated by pepper spray used by both Simmons and Moody. Thus, the Defendant Jailers were aware of facts from which the inference could be drawn that a substantial risk of serious harm existed. *Dyer,* 964 F.3d at 380.

**4. The Defendant Jailers actually drew that inference.**

178. The Defendant Jailers drew this inference because they acknowledged that Johnson was unconscious and was aware that he had become nonresponsive.

179. The Defendant Jailers' actual knowledge of the substantial risk can be inferred because it was so obvious and the need was so apparent that even a laymen would recognize that care is required - as Johnson was unable to stand, Johnson's breathing was labored, Johnson was foaming at the mouth, Johnson became non-responsive, and Johnson body was limp. *Dyer,* 964 F.3d at 380; Thus, the Defendant Jailers drew the inference that a substantial risk of serious

harm existed.

180. Accordingly, the Defendant Jailers were deliberately indifferent to Johnson's health and safety because the Defendant Jailers "refused to treat him ... or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs" by not providing medical care or summoning medical care for Johnson - instead, ignoring Johnson. *Domino,* 239 F.3d at 756 (quoting *Johnson,* 759 F.2d at 1238).

**5. Defendants Moreno, Garcia, Simmons, Marez, Nymoen, Caldwell, Moody, Nobles, Hollie, Sanchez, Stubbs, Gill, Pitcock, Longo and Russ.**

181. Plaintiffs would show that Defendants Moreno, Garcia, Simmons, Marez, Nymoen, Caldwell, Moody, Nobles, Hollie, Sanchez, Stubbs, Gill, Pitcock, Longo and Russ failed to act as a reasonable jailer would have acted in the same or similar circumstances. Defendant Garcia is likewise liable for Defendants Moreno, Simmons, Marez, Nymoen, Caldwell, Moody, Nobles, Hollie, Sanchez, Stubbs, Gill, Pitcock, Longo and Russ's failure to render medical aid and to intervene as either their supervisor or as a bystander. A claim of bystander liability requires the claimant to prove (1) the by-standing officer knew that a fellow officer was violating an individual's constitutional rights, and (2) the officer had a reasonable opportunity to prevent the violation but chose not to act. Supervisory liability requires a showing that the supervisor acted, or failed to act, with deliberate indifference to their subordinates' constitutional violations. Both supervisory and bystander liability under Section 1983 is based on the principle that, by choosing not to intervene and prevent an unconstitutional exercise of excessive force, the passive officer effectively participates in his fellow officer's acts.

182. Garcia, like Defendants Moreno, Simmons, Marez, Nymoen, Caldwell, Moody, Nobles, Hollie, Sanchez, Stubbs, Gill, Pitcock, Longo and Russ knew that Johnson needed medical attention but failed to check on Johnson, who became nonresponsive after advising the Defendant

Jailers that he could not breathe. Defendant Garcia observed the entire incident and knew that Johnson became nonresponsive but deliberately chose to do nothing. There was adequate time for Defendants Garcia, Moreno, Simmons, Marez, Nymoen, Caldwell, Moody, Nobles, Hollie, Sanchez, Stubbs, Gill, Pitcock, Longo and Russ to intervene to prevent Johnson's death.

183. Defendants Garcia, Moreno, Simmons, Marez, Nymoen, Caldwell, Moody, Nobles, Hollie, Sanchez, Stubbs, Gill, Pitcock, Longo and Russ had a reasonable opportunity to intervene, contact emergency personnel and to provide Johnson with medical attention but instead they simply chose not to do anything.

184. By choosing not to intervene, Garcia effectively participated in Defendants Moreno, Simmons, Marez, Nymoen, Caldwell, Moody, Nobles, Hollie, Sanchez, Stubbs, Gill, Pitcock, Longo and Russ's wrongful acts. Defendants Garcia, Moreno, Marez, Nymoen, Caldwell, Nobles, Hollie, Sanchez, Stubbs, Gill, Pitcock, Longo and Russ likewise failed to intervene as Defendant Simmons and Moody discharged pepper spray directly into Johnson's mouth and face.

185. Since at least 1995, it has been clearly established in the Fifth Circuit that an individual officer is subject to bystander liability under Section 1983 if he or she knew a constitutional violation was being committed by a fellow officer and had a reasonable opportunity to prevent the harm. *Hamilton v. Kindred*, 845 F.3d 659, 663 (5th Cir. 2017) (citing *Hale v. Townley*, 45 F.3d 914, 918 (5th Cir. 1995), for principle that "it was clearly established in the Fifth Circuit that an officer could be liable as a bystander in a case involving excessive force if he knew a constitutional violation was taking place and had a reasonable opportunity to prevent the harm."). Likewise, it was clearly established at the time of the incident that a supervisor is subject to liability under Section 1983 where the supervisor, with deliberate indifference, failed to act or otherwise prevent the constitutional violations perpetrated by their subordinates. *See, e.g., Porter v. Epps*,

659 F.3d 440, 446 (5th Cir. 2011).

186. As a direct and proximate result of Defendant Garcia's failure to prevent Defendants Moreno, Simmons, Marez, Nymoen, Caldwell, Moody, Nobles, Hollie, Sanchez, Stubbs, Gill, Pitcock, Longo and Russ's violation of Johnson's constitutional rights and by refusing to render medical assistance to Johnson, Plaintiffs incurred extreme pain and injuries for which they seek compensation as set forth more specifically in the section of this Complaint entitled "Damages."

## VI.
## DAMAGES

187. **Actual damages.** Plaintiffs incorporate by reference paragraphs 1 through 186 as if fully set forth herein. Defendants' acts and/or omissions were a proximate cause and the moving force behind the following actual damages suffered by the Plaintiffs, and the Defendants should be held jointly and severally liable for the following damages:

**(a) Estate of Anthony Johnson, Jr. (Survival Claim).**

1. Conscious pain and mental anguish suffered by Anthony Johnson, Jr. prior to his death;
2. Funeral and burial expenses;
3. Loss of value of life; and
4. Exemplary Damages.

**(b) Anthony Johnson, Sr. (as wrongful death beneficiary of Anthony Johnson, Jr.).**

1. Mental anguish—the emotional pain, torment, and suffering experienced by Anthony Johnson, Sr. because of the death of Anthony Johnson, Jr.—that Anthony Johnson, Sr. sustained in the past and that he will, in reasonable probability, sustain in the future;

2. Loss of companionship and society—the loss of the positive benefits flowing from the love, comfort, companionship, and society that Anthony Johnson, Sr. would have received from Anthony Johnson, Jr. had he lived—that Anthony Johnson, Sr. sustained in the past and that he will, in

reasonable probability, sustain in the future;

3. Pecuniary loss—loss of the care, maintenance, support, services, advice, counsel, and reasonable contributions of a pecuniary value that Anthony Johnson, Sr. would have received from Anthony Johnson, Jr. had he lived—that Anthony Johnson, Sr. sustained in the past and that he will, in reasonable probability will sustain in the future.

**(c) Jacqualyne Y. Johnson (as wrongful death beneficiary of Anthony Johnson, Jr.).**

1. Mental anguish—the emotional pain, torment, and suffering experienced by Jacqualyne Y. Johnson because of the death of Anthony Johnson, Jr.—that Jacqualyne Y. Johnson sustained in the past and that she will, in reasonable probability, sustain in the future;

2. Loss of companionship and society—the loss of the positive benefits flowing from the love, comfort, companionship, and society that Jacqualyne Y. Johnson would have received from Anthony Johnson, Jr. had he lived—that Jacqualyne Y. Johnson sustained in the past and that she will, in reasonable probability, sustain in the future;

3. Pecuniary loss—loss of the care, maintenance, support, services, advice, counsel, and reasonable contributions of a pecuniary value that Jacqualyne Y. Johnson would have received from Anthony Johnson, Jr. had he lived—that Jacqualyne Y. Johnson sustained in the past and that she will, in reasonable probability will sustain in the future.

188. **Punitive/Exemplary Damages against Defendants Garcia, Moreno, Simmons, Marez, Nymoen, Caldwell, Moody, Nobles, Hollie, Sanchez, Stubbs, Gill, Pitcock, Longo and Russ.** Punitive/exemplary damages are recoverable under section 1983 when the conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others. Here, the conduct of Defendants Garcia, Moreno, Simmons, Marez, Nymoen, Caldwell, Moody, Nobles, Hollie, Sanchez, Stubbs, Gill, Pitcock, Longo and Russ were done with evil motive or intent, or at the very least, was reckless or callously indifferent to the federally protected rights of Johnson. As such, Plaintiffs request punitive and exemplary damages from Defendants Garcia, Moreno, Simmons, Marez, Nymoen, Caldwell, Moody, Nobles,

Hollie, Sanchez, Stubbs, Gill, Pitcock, Longo and Russ to deter this type of conduct in the future.

189. Loss of services

190. Loss of income

191. Prejudgment and post judgment interest.

192. Costs of court.

193. Reasonable and necessary attorneys' fees incurred by the Plaintiffs through trial, and reasonable and necessary attorneys' fees that may be incurred by the Plaintiffs for any post-trial proceedings, or appeal, interlocutory or otherwise, pursuant to 42 U.S.C. § 1988.

194. Plaintiffs seek unliquidated damages in an amount that is within the jurisdictional limits of the court.

**VII.**

**CONDITIONS PRECEDENT**

195. Plaintiffs reserve their right to plead and prove the damages to which they are entitled to at the time of trial. All conditions to Plaintiffs' recovery have been performed or have occurred.

**VIII.**

**TRIAL BY JURY**

196. Plaintiffs have paid a jury fee and demands trial by jury.

**XI.**

**PRAYER**

WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray that Defendants be cited to appear and answer herein; that upon final trial hereof Plaintiffs have and recover judgment from Defendants; actual damages, exemplary damages, pre-judgment interest at the legal rate; interest

on said judgment at the legal rate; costs of court; and such other and further relief, both general and special, at law and in equity, to which Plaintiffs are justly entitled.

Respectfully submitted,

By: /s/ DARYL K. WASHINGTON
Daryl K. Washington
State Bar No. 24013714
WASHINGTON LAW FIRM, PC
325 N. St. Paul St., Suite 3950
Dallas, Texas 75201
214-880-4883
214-751-6685 - fax
Email: dwashington@dwashlawfirm.com

**ATTORNEYS FOR THE PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify that on **October 7, 2024**, I electronically filed the foregoing document with the clerk of the court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court. The electronic case filing system sent a "Notice of Electronic Filing" to the attorneys of record who have consented in writing to accept this notice as service of this document by electronic means:

*/s/ Daryl K. Washington*
**Daryl K. Washington**